**STARK & STARK, P.C.**
993 Lenox Drive, Building Two
Lawrenceville, New Jersey 08648
609-896-9060
Martin P. Schrama, Esq.
Craig S. Hilliard, Esq.
Stefanie Colella-Walsh, Esq.
Email:  mps@stark-stark.com
        csh@stark-stark.com
        scw@stark-stark.com

**GORMAN & GORMAN, LLC**
Liberty View, Suite 400
457 Haddonfield Road
Cherry Hill, NJ 08002
856-665-4300
Scott B. Gorman, Esq.
Email: sgorman@gormanlegal.com

*Attorneys for Plaintiffs and Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DUANE BUCK AND ANN BUCK, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> AMERICAN GENERAL LIFE INSURANCE COMPANY, <br><br> Defendant. | **Document Electronically Filed** <br><br> Civil Action No.:  1:17-cv-13278-NLH-KMW <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Duane Buck and Ann Buck ("Plaintiffs"), residing at 5520 Clayton Avenue, Pennsauken,

New Jersey, by and through their undersigned Counsel, on behalf of themselves and all persons

similarly situated, for their Class Action Complaint against American General Life Insurance Company ("AGLIC") with an address at 2727-A Allen Parkway, Houston, Texas, allege the following based on personal knowledge as to allegations regarding Plaintiffs and upon information and belief as to other allegations. The causes of action set forth below are pled alternatively and conjunctively.

## I.     <u>THE PARTIES</u>

1.     Plaintiffs, husband and wife, are both domiciled in New Jersey. While residing in the State of New Jersey, Plaintiffs purchased a universal life insurance policy called a "flexible premium adjustable life insurance policy" (the "Policy"). Plaintiffs purchased the Policy in 1984, from The Old Line Life Insurance Company of America, a predecessor entity of AGLIC, and the Policy has remained in full force and effect since that time.

2.     AGLIC is incorporated in the State of Texas and has its principal place of business in Houston, Texas. AGLIC is a citizen of the State of Texas. AGLIC is not a citizen of the State of New Jersey. American General Life Insurance Company merged with The Old Line Life Insurance Company of America in 2003. The product of that merger is AGLIC.

3.     Among other things, AGLIC is engaged in the business of providing insurance and investment products to consumers, including Plaintiffs and members of the Putative Class. AGLIC has numerous offices located in Texas, Tennessee and Illinois. Representatives of AGLIC located in some of these offices corresponded directly with Plaintiffs. AGLIC is licensed to do business as an insurance company in every State in the United States (and the District of Columbia), except the State of New York. AGLIC has over 10,000 independent agents who are located throughout the United States, including those located in the State of New Jersey.

4816-6024-0730, v. 1

## II.   **JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d). Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the Putative Class members exceed the sum of $5,000,000, exclusive of interest and costs, and at least one of the class members is a resident of a different State than AGLIC.

5.      AGLIC is subject to this Court's personal jurisdiction because AGLIC consented to personal jurisdiction in the State of New Jersey, by appointing the Insurance Commissioner of New Jersey as its registered agent, and by consenting to the service of process upon the Insurance Commissioner.

6.      In addition, AGLIC is subject to this Court's personal jurisdiction because it regularly conducts business in the State of New Jersey, including, but not limited to, AGLIC regularly issuing universal life insurance policies in New Jersey, to New Jersey residents, including the Policy issued to Plaintiffs. AGLIC has approximately 100,000 individual life insurance policies in force in New Jersey for which it receives over $100 million in premiums annually. In 2016 alone, AGLIC was paid approximately $600 million in premiums by New Jersey residents on AGLIC's existing insurance policies (including AGLIC's universal life insurance policies). Additionally, AGLIC made misrepresentations to the New Jersey resident Plaintiffs, and other similarly situated policyholders, in New Jersey. AGLIC's breaches of its contracts with Plaintiffs, and other similarly situated policyholders, have caused harm, and will continue to cause further harm, in New Jersey.

7.      Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391, because AGLIC is subject to personal jurisdiction here and regularly conducts business in this

District. In addition, a substantial part of the events or omissions giving rise to the claims asserted herein occurred, and continue to occur, in this District.

## III.   <u>INTRODUCTION</u>

8.     This action involves "universal" life insurance policies issued by AGLIC. Universal life insurance is a form of permanent life insurance also known as "flexible premium" adjustable life insurance. Universal life insurance is designed to give policyholders flexibility, both in the payment of premiums and the adjustment of death benefits.

9.     While term insurance is designed to provide coverage for a specified period of time, permanent insurance is designed to provide coverage for the policyholder's entire lifetime. To keep the premium rate level, the premium at the younger ages exceeds the actual cost of insurance. This extra premium builds a reserve ("cash value") which helps pay for the policy in later years as the cost of insurance rises above the premium.

10.     The insurance company invests the excess premium dollars to acquire assets in support of the reserve.

11.     Whole life policies, such as universal life, stretch the cost of insurance over a longer period of time in order to level out the otherwise increasing cost of insurance. Under some whole life policies, premiums are required to be paid for a set number of years. Under other policies, premiums are paid throughout the policyholder's lifetime.

12.     Whole life is sometimes called cash value life insurance, because it generates a savings element. Cash values are critical to a permanent life insurance policy. The size of the cash value build-up (also known as "inside build-up") differs from company to company.

13.     A whole life policy's essential elements consist of the "premium" payable each year, the "death benefits" payable to the beneficiary and the "cash surrender value" the

4

policyholder would receive if the policy is surrendered prior to death. The policyholder may borrow money against the cash value of the policy at a specified rate of interest or a variable rate of interest, but such outstanding loans, if not repaid, will reduce the death benefit.

14. Universal life works by treating the three basic elements of the policy (premium, death benefit and cash value) separately. The insurance company credits policyholders' premiums to the cash value account. Periodically, the insurance company deducts its expenses and the cost of insurance (based upon the "mortality risk") from the cash value account. The balance of the cash value account accumulates at the interest credited. The company guarantees a minimum interest rate and a maximum cost of insurance, along with associated fees charged by the insurance company.

15. Universal life is also the most flexible of all the various kinds of policies. Because it treats the elements of the policy separately, universal life allows policyholders to change or skip premium payments or change the death benefit more easily than with any other policy. Policyholders generally pay a planned premium designed to keep the policy in force for a specific period of time or for life, and accumulate cash value, based upon the interest, cost of insurance, and fees. The policy will not lapse for non-payment of premium, as long as the cash value is sufficient to cover the cost of insurance and fees. However, if the cash value is not sufficient to cover these charges, a premium is required to keep the policy in force.

16. To enjoy preferred tax treatment, all life insurance policies must comply with certain federal tax requirements, such as limitations on the amount of premium that may be paid in relation to the face amount of coverage, and a minimum ratio between cash value and the face amount of coverage.

5

17.     Universal life insurance policies are marketed to policyholders, and relied upon by policyholders and their families as protection against the catastrophic loss of a family member. Accordingly, universal life insurance policies are sold and utilized as an investment vehicle, as well as an integral part of financial and estate planning.

18.     With respect to premium payments, policyholders can generally pay more than the agreed-upon planned premiums into their account if they wish to accumulate tax-deferred interest (subject to the limitations described above). This tax-advantaged increase of the cash value is one of the primary benefits of universal life insurance policies and one of the main reasons people purchase such policies. Another important benefit attracting people to purchase universal life insurance is the favorable income tax treatment afforded the death benefit. Policyholders place their trust in the insurance company to protect them with respect to these tax-advantaged benefits.

19.     Here, AGLIC provided faulty calculations to its universal life insurance policyholders depicting how decreases in death benefits and/or changes in the amount of premiums would affect the maximum premium payments policyholders could make without resulting in a violation of federal tax regulations and causing adverse tax consequences to the policyholders. Such adverse tax consequences include rendering cash values and/or death benefits of policyholders taxable. Specifically, AGLIC did not disclose its faulty calculations to Plaintiffs, who continued to pay planned premiums at the level and frequency which Plaintiffs and AGLIC had agreed upon.

20.     Years after AGLIC provided and/or discovered its faulty calculations, AGLIC falsely represented to policyholders that the problem was *their* fault, and wrongfully demanded that policyholders choose between three options, all of which would harm the policyholders:

a) "Surrender the policy for its cash value."

b) "Increase the death benefit, (Underwriting required). You must complete a Policy Change Form."

c) "Maintain the current policy until its accumulation value is exhausted. Then pay in the necessary premium required to carry the policy until the next policy anniversary every year."

21.    The above actions of AGLIC constitute deceptive conduct and anticipatory breaches of AGLIC's contracts with its policyholders.

22.    AGLIC further refused to accept payment of policyholders' premiums after AGLIC provided and/or discovered its faulty calculations, thereby depriving policyholders of the promised growth and tax benefits of their universal life insurance policies. AGLIC's refusal to accept premiums constitutes an additional breach of AGLIC's contracts with policyholders.

23.    AGLIC also instituted "partial surrenders" and/or "surrenders" of the universal life insurance policies by sending checks to policyholders for "accumulated value" (which is equal to the cash value), even though the policyholders never agreed to any surrender or partial surrender of their policies. *Only* the policyholders had the contractual right in these policies to surrender or partially surrender their policies. AGLIC's unilateral declaration of surrenders and partial surrenders of these policies was an additional breach of contract. By prematurely distributing cash value of such policies to the policyholders, the policyholders were prevented from receiving the promised minimum tax-free, guaranteed interest rate on the cash value that they had been accumulating within their policies.

24.    AGLIC's breaches of its contracts with policyholders include, but are not limited to:

a) AGLIC's failure and refusal to fulfill the terms of the policies;

b) AGLIC's anticipatory and actual repudiation of the policies;

c) AGLIC's false representations and knowing omissions to policyholders in providing Illustrations and Annual Reports as to the planned premiums (which AGLIC and policyholders had agreed upon) remaining at the same dollar amount, and the policies remaining in effect, for a specified number of years;

d) AGLIC's refusal to accept payment of planned premiums which AGLIC and policyholders had previously agreed would be paid by the policyholders and accepted by AGLIC;

e) AGLIC's failure to correct "bugs" or "glitches" in its compliance systems, which had been present for many years and which caused the faulty calculations provided by AGLIC to its policyholders;

f) AGLIC's failure and refusal to fulfill its contractual promises as to the agreed-upon premiums remaining at the same dollar amount, and each policy remaining in effect, for a specified number of years;

g) AGLIC's failure and refusal to fulfill its contractual promise to allow the funds invested by policyholders, to continue to increase at the guaranteed annually compounded, tax-free minimum interest rate; and

h) AGLIC's instituting "partial surrenders" and/or surrenders of these policies by sending checks to policyholders for "accumulated value," even though the policyholders never requested or agreed to the surrender or partial surrender of their policies.

25.     Plaintiffs, by and through undersigned Counsel, bring this action on behalf of themselves and on behalf of a nationwide class of all other similarly situated policyholders, as defined below, to redress AGLIC's breaches of its universal life insurance policies.

## IV.    AGLIC'S FAILURE TO ENSURE COMPLIANCE WITH FEDERAL TAX LAWS

26.     Universal life insurance, when properly structured, allows for the tax-free accumulation and growth of money. Accordingly, there is a market for this type of life insurance throughout the United States.

27.     Due to the tax advantages afforded by all types of life insurance policies, life insurance is heavily regulated under federal tax laws in order to avoid potential abuse of virtually unlimited tax shelter investments. Under the Deficit Reduction Act of 1984

8

("DEFRA"), contracts and investment vehicles must meet certain defined criteria in order to qualify as a life insurance policy, and therefore afford the benefits of tax-advantaged status.

28.     Among other things, DEFRA limits the total amount of premiums that can be paid into a life insurance policy, relative to the death benefit provided. If the premiums exceed the applicable cap, the policy may no longer be considered a life insurance policy under 26 U.S.C. § 7702.

29.     Additionally, under a separate section of the Internal Revenue Code, a contract that otherwise meets the definition of life insurance under § 7702, but is overfunded pursuant to a calculation called the "7-pay test," becomes a Modified Endowment Contract ("MEC"), under 26 U.S.C. § 7702A.

30.     Once a life insurance policy no longer meets the statutory definition of 26 U.S.C. § 7702, or is classified as an MEC under 26 U.S.C. § 7702A, income earned on the policy from the time of noncompliance, including accumulated interest on cash value, is rendered fully taxable. The death benefit of the policy is also rendered taxable. If a policy is classified as an MEC, the policy loses its tax-advantaged treatment forever.

31.     When AGLIC sold its universal life policies, it assured policyholders that the "planned premiums" (the agreed upon amounts that policyholders were to pay) would be set at an amount low enough that the policyholders' investment would remain tax-advantaged. This was a substantial part of the inducement to purchase universal life policies as part of policyholders' financial and estate planning strategies. Additionally, AGLIC advised policyholders that, to the extent they sought to pay "additional premiums" (additional sums over and above the planned premium amounts), the policyholders could only do so insofar as such additional payments did not cause the policy to become overfunded and lose its tax-

advantaged status. Specifically, AGLIC advised its policyholders that it would "refund" such excess additional premium payments in order to ensure DEFRA compliance.

32.     DEFRA is too complicated for policyholders to know whether their policies are in compliance or not. Such an analysis involves complex legal and accounting principles, coupled with intricate actuarial formulae. Therefore, purchasers of tax-advantaged universal life insurance policies reasonably rely on their insurance company to ensure compliance with all applicable laws, including tax laws.  This is especially so considering that it is the insurance company which agrees to the amount of the planned premium that policyholders plan to pay and determines whether such payments shall be in compliance with DEFRA.

33.     Universal life insurance policies generally allow the policyholders to make certain changes to their coverage, such as increasing or decreasing the death benefits or adjusting their level or frequency of premium payments. When policyholders make such changes, AGLIC provides the policyholders with an "Illustration" of the effect the changes will have on the policy terms, such as its maturity date, cash value, cost of insurance rate, and surrender charges.

34.     Purchasers of tax-advantaged universal life insurance policies reasonably rely on the Illustrations and projections of their insurance company when deciding whether their desired changes will allow the investment in their policies to grow tax-free.

35.     In addition to Illustrations, which are provided on an as-needed basis, AGLIC provides policyholders with an "Annual Report." The Annual Report shows, among other things, the policy's current death benefit, current cash value, total amount of premiums paid, total accumulated growth, and total charges assessed.

36.     For many AGLIC policyholders who exercised their contractual right to make changes to their policies, AGLIC's Illustrations and Annual Reports did not recognize or advise that policies would lose their tax-advantaged status as a result of the changes. In many instances, policyholders were induced to make such changes by AGLIC's faulty Illustrations and Annual Reports. Consequently, these policyholders paid their premiums and saw their cash values increase at the tax-free, guaranteed rate for years after the policy changes went into effect, without any notice from AGLIC that there was, or could be, a problem.

37.     Despite having paid their premiums without incident long after their changes were reviewed and approved by AGLIC, many AGLIC policyholders were surprised to receive letters, years later, informing the policyholders that their policies had fallen out of compliance with DEFRA regulations. In these letters, AGLIC misrepresented to the policyholders that the cause of the noncompliance was the policyholders' own policy changes, combined with the premiums paid after the changes.

38.     However, the true cause of any noncompliance issues was not the policyholders' changes or premium payments, but, rather, AGLIC's failure to correctly determine the implications of the changes its policyholders were making. Upon information and belief, AGLIC's compliance procedures and software were defective to such a degree that AGLIC could not, and did not, accurately ascertain whether policyholders' changes would cause policies to fail to meet the definition of life insurance under 26 U.S.C. § 7702, or become a MEC under 26 U.S.C. § 7702A.

39.     As a result, many of AGLIC's universal life insurance policyholders were put in danger of losing the guaranteed benefits of their policies through no fault of their own.

4816-6024-0730, v. 1

Notwithstanding, AGLIC exacerbated the problem by impermissibly attempting to shift the consequences of its mistake onto its policyholders.

V.     **FACTUAL ALLEGATIONS RELATING TO PLAINTIFFS**

    **A.     Life Insurance Policy with Investment Guarantee Issued in 1984**

    40.     The allegations in this section concern AGLIC's conduct toward the named Plaintiffs and Putative Class representatives in this case. Upon information and belief, the events described herein are typical of the experience of AGLIC policyholders.

    41.     In 1984, Plaintiffs purchased the Policy, which provided death benefits of $70,000 and $25,000, respectively, for each of the Plaintiffs. An additional Rider provided life insurance of $5,000 for each of Plaintiffs' three children. The Policy set a maturity date of December 10, 2049, at which point Plaintiffs would be 100 and 99-years-old, respectively. Attached hereto as **Exhibit A** is a true copy of the Policy.

    42.     AGLIC promised to provide Plaintiffs with an Annual Report showing how long coverage would continue based on current and guaranteed assumptions, as follows:

> The Disclosure Statement which was delivered with this policy shows how long coverage will continue on the basis of current and guaranteed assumptions. The Annual Report sent to the Owner each year will update this information.

Ex. A, p. 1.

    43.     To the extent premiums paid exceeded the cost of insurance component of the Policy, the cash value of the Policy increased at a tax-free, minimum guaranteed interest rate of 4.5%, compounded yearly. As promised by AGLIC, "The guaranteed cash value interest rate is 4.5% per year, compounded yearly." Ex. A, p. 1.

44.     The Policy provided Plaintiffs, and only Plaintiffs, with the right to surrender the Policy for surrender value, or to make a partial surrender. Ex. A, p. 7. The Policy did not provide AGLIC with any such rights. Ex. A.

45.     The Policy also contained AGLIC's promises: a) to send an Annual Report showing the critical financial data to Plaintiffs at least once a year; and b) to provide Illustrations of future benefits and cash values (based on assumptions as to specified amount, coverage options and future premium payments). Ex. A, p. 9.

### B.     Amendments to Policy in 2008

46.     In 2008, Plaintiffs were 59 and 58-years-old, respectively. In September 2008, the cash value of the Policy was down to $260. On or about September 29, 2008, AGLIC provided Plaintiffs with an Illustration showing certain changes in their policy based on Plaintiffs paying higher premiums of $1,488 per year (instead of the $600 per year that they had been paying), and a reduction in the death benefits from $100,000 to $25,000 for Mr. Buck and $50,000 to $25,000 for Mrs. Buck.[1] AGLIC's Illustration showed coverage lasting for 32 years until 2040 (when Plaintiffs would be 91 and 90-years-old, respectively) under "current policy conditions" (the current death benefits, costs of insurance, fees charged by AGLIC, and planned premium payments).

47.     On or about September 30, 2008, based on AGLIC's September 29, 2008 Illustration, Plaintiffs requested changes to the Policy whereby: a) there would be a $25,000 death benefit for each of the Plaintiffs, respectively (replacing the previous death benefits of $100,000 for Mr. Buck and replacing the $50,000 death benefit for Mrs. Buck); and b) the Rider for Plaintiffs' children would be removed.

---

[1] Prior to 2008, the death benefit for Mr. Buck had been increased from $70,000 to $100,000, and the death benefit for Mrs. Buck had been increased from $25,000 to $50,000.

48.     As requested, in October or November 2008, AGLIC removed the children's Rider, decreased the death benefit for Mr. Buck to $25,000, and decreased the death benefit for Mrs. Buck to $25,000.   Attached hereto as **Exhibit B** is a true copy of Plaintiffs' Request, together with AGLIC'S 2008 Illustration, and the Endorsements to the Policy issued by AGLIC in October and November 2008.

49.     The Annual Reports provided by AGLIC to Plaintiffs between 2009 and 2015 correspondingly showed that coverage would remain in effect, with the same dollar amount of premiums, until at least 2040 under current policy conditions.

50.     In 2010, AGLIC provided Plaintiffs with a similar Illustration showing coverage lasting until 2049 (when Plaintiffs would be 100 and 99-years-old, respectively) under current policy conditions. AGLIC has never explained why this Illustration in 2010 shows coverage lasting nine years longer than the other Illustrations and Annual Reports issued by AGLIC since 2008.

51.     Other Annual Reports provided by AGLIC between 2009 and 2015 similarly showed that coverage would remain in effect with the same dollar amount of premiums until 2040 (at which point Plaintiffs would be 91 and 90-years-old, respectively) under current policy conditions.

52.     Plaintiffs justly relied on the accuracy of AGLIC's representations, Illustrations and Annual Reports in determining to purchase the Policy, make changes to the Policy and continue the Policy in place. Had Plaintiffs known that AGLIC's representations were false, Plaintiffs would not have made the determination to purchase, change, or continue the Policy.

53.     There were no material changes in the current policy conditions following the changes to the Policy in 2008.

14

**C.      Violation of Federal Regulations Revealed in 2016**

54.      On or about January 7, 2016, without any prior warning, AGLIC sent Plaintiffs a "DEFRA Letter" stating that the Policy was out of compliance with DEFRA, along with an attached "Policy Option Form." This was the first time Plaintiffs were ever made aware that there was a problem with the Policy. Attached hereto as **Exhibit C** is a true copy of AGLIC's DEFRA Letter and Policy Option Form.

55.      Specifically, AGLIC's DEFRA Letter stated that, "[N]otwithstanding prior correspondence, including any illustrations and/or premium notices you have received indicating that you may continue premium payments; your policy has exceeded its premium guideline limit." In this manner, AGLIC informed Plaintiffs, for the first time, that the Policy had "reach[ed] an out of compliance state in accordance with federal regulations." Ex. C, p. 1.

56.      Additionally, AGLIC asserted that the cause of the Policy's noncompliance with DEFRA was Plaintiffs' own decrease in death benefits in 2008 "combined with" Plaintiffs' premium payments since then. (Ex. C, p. 1).  AGLIC's assertion was patently and knowingly false. AGLIC accepted Plaintiffs' change in death benefits in 2008, as well as all of Plaintiffs' premium payments after that, without ever advising Plaintiffs of any problems or potential problems. None of AGLIC's Illustrations or Annual Reports, between the date the Policy was changed in 2008, and the date of the DEFRA Letter in 2016, indicated to Plaintiffs that their change had caused, or would cause, the Policy to lose its tax advantages.

57.      Upon information and belief, the actual reason the Policy was put in danger of noncompliance with DEFRA was that AGLIC's faulty compliance systems failed to accurately and/or timely recognize the implications of Plaintiffs' Policy changes until it was too late.

4816-6024-0730, v. 1

58.     AGLIC repeatedly assured Plaintiffs that the Policy would remain tax-advantaged, and AGLIC failed to recognize or advise, for more than seven years, that DEFRA issues might have been raised by Plaintiffs' policy changes in 2008. Moreover, the decreases in death benefits in 2008, and Plaintiffs' payment of planned premiums since 2008, were in accordance with AGLIC's Illustrations and Annual Reports.

59.     Therefore, AGLIC cannot plausibly or legitimately blame Plaintiffs for jeopardizing or losing the tax-advantaged status and benefits of the Policy. Similarly, AGLIC cannot plausibly or legitimately blame any other affected policyholder for causing the same noncompliance issues.

**D.     AGLIC's Self-Serving Policy Option Form**

60.     AGLIC further insisted in its DEFRA Letter and Policy Option Form that Plaintiffs agree to modify their existing Policy by choosing one of only three options contrived solely by AGLIC. AGLIC informed Plaintiffs that, unless Plaintiffs chose one of AGLIC's forced options within a month, AGLIC would "automatic[ally]" surrender the Policy, even though the Policy only gives the policyholder, and *not* AGLIC, the right to surrender the Policy. Ex. C, p. 2.

61.     The contrived options provided to Plaintiffs were set forth in a standardized Policy Option form created by AGLIC that was attached to AGLIC's DEFRA Letter. The fact that the Policy Option Form was standardized and not narrowly tailored to Plaintiffs' particular situation indicates that the issue Plaintiffs' were facing was not an isolated incident, but rather a pervasive problem at AGLIC. Ex. C, p. 3.

62.     That standardized Policy Option Form states:

## Policy Option

Please select one of the following options:

1. _____ Increase the death benefit (Underwriting required).
   You must complete a policy change form.

2. _____ Surrender the policy for its cash value.

3. _____ Maintain the current policy until the accumulation value of the policy
   is exhausted. Then pay in the necessary premium until the next policy
   anniversary every year.

Ex. C, p. 3.

63.     Each of the options listed in Exhibit C was to the benefit of AGLIC and to the detriment of Plaintiffs, as well as a breach of contract and a breach of the duty of good faith and fair dealing owed by AGLIC to its policyholders.

64.     If Plaintiffs chose option "1," and increased their death benefits: a) it would force Plaintiffs to purchase more life insurance than they wanted or needed; b) it would force Plaintiffs to pay premiums to cover the cost of insurance in an unknown amount (although such premiums would almost certainly be higher, due to increased death benefits, than the amounts set forth in AGLIC's previous Illustrations and Annual Reports); and c) it would subject Plaintiffs to the risk that AGLIC might deem Plaintiffs to be "uninsurable."

65.     AGLIC stood to benefit from option "1" because, if Plaintiffs were insurable, AGLIC would receive higher premiums as a result of a higher death benefit. However, if Plaintiffs were not insurable, AGLIC would get the risk of the Policy entirely off of AGLIC's books before the Policy reached full cash value maturity and before AGLIC had to pay the full death benefit on the face of the Policy.

66.     If Plaintiffs chose option "2" and surrendered their Policy for its cash value, Plaintiffs would not only lose their death benefits but would forego having their accumulated

17

cash value, plus the future planned premiums, continue to grow at the tax-free, minimum guaranteed interest rate of 4.5%, compounded annually.

67.    Again, AGLIC stood to benefit from option "2" because, if the Policy was surrendered, AGLIC would no longer bear the risk of having to pay death benefits and would no longer have to guarantee the growth of the Policy's cash value.

68.    Finally, if Plaintiffs chose option "3" and maintained their current Policy until its "accumulation value" was exhausted, Plaintiffs would seemingly keep their death benefits, but lose the return on their investment into their Policy and be prevented from accumulating future cash value (which would effectively lead to Plaintiffs ultimately losing their death benefits once their ages made the life insurance component of the Policy too expensive to maintain). The premiums Plaintiffs had paid into the Policy for decades had resulted in the cash value of their Policy growing, or "accumulating," into a substantial sum. But by choosing option 3, Plaintiffs would lose that accumulating cash value and be prevented from increasing the cash value of the Policy through the tax-free, guaranteed interest payable on the existing cash value, as well as additional planned premiums in the future.

69.    AGLIC stood to benefit if Plaintiffs chose option "3" because if the accumulated cash value of the Policy was exhausted, then AGLIC no longer faced the prospect of having to pay a larger cash surrender value, and instead would put the sum that Plaintiffs' had accumulated (the cash value of the Policy) back into AGLIC's own pocket.

70.    AGLIC's Policy Option Form and/or its DEFRA letter did not comply with the Policy Language Simplification Act which established standards for the language used in life insurance policies, as set forth in the Model Act created by the National Association of

Insurance Commissioners. This Act has been adopted by 27 states and the District of Columbia.[2] An older version has been implemented by another seven states.[3]

### E.    AGLIC Unilaterally Initiated a Partial Surrender of Plaintiffs' Policy

71.    After receiving the DEFRA Letter and Policy Option Form from AGLIC, Plaintiffs refused to make any of the unilaterally imposed choices AGLIC insisted upon.

72.    AGLIC subsequently sent a number of letters to Plaintiffs in 2016, stating that the Policy could not proceed on the same terms previously set forth in AGLIC's Illustrations and Annual Reports.

73.    By letter to Plaintiffs dated April 1, 2016, AGLIC reiterated that it would surrender Plaintiffs' Policy if Plaintiffs did not choose one of the options set forth in the DEFRA Letter and Policy Option Form. Specifically, AGLIC stated that it "reserves the right to exercise the automatic option of surrendering the policy if we do not receive your response by April 15, 2016."

74.    By letter dated July 28, 2016, AGLIC again told Plaintiffs that if Plaintiffs did not choose one of the options in the next 7 days, then AGLIC would just implement option 1.

75.    By letter dated January 13, 2017, AGLIC told Plaintiffs that, despite there not having been any payments paid into the Policy over the past year, the Policy "was again overfunded in accordance with DEFRA." AGLIC also stated that it would be mailing a check

---

[2]  Arizona, Arkansas, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Indiana, Maine, Maryland, Massachusetts, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Virginia, West Virginia, and Wisconsin. *http://www.naic.org/store/free/MDL-575.pdf*

[3] California, Kentucky, Michigan, Minnesota, Rhode Island, Texas, and Utah.
*http://www.naic.org/store/free/MDL-575.pdf*

4816-6024-0730, v. 1

for $3,260, "which represents a refund of the amount overfunded." AGLIC did not explain how it arrived at this figure.

76.     In the same letter, AGLIC separately advised that, in addition to initiating a partial surrender of the Policy, it had automatically chosen to convert Plaintiffs' "accumulation value" into payments of premiums until the accumulation value was exhausted, and that additional "refunds" might be required until the accumulation value was exhausted. At that time, according to AGLIC, Plaintiffs could begin paying premiums again.

77.     By separate letter dated January 17, 2017, AGLIC advised Plaintiffs that "we have completed your request for a partial surrender of your policy" and forwarded a check for $3,260.00. The cover letter described the check as a "partial surrender check," but the "explanation" under the check itself noted that it represented a "DEFRA violation refund."

78.     Plaintiffs never requested or agreed to a partial surrender of the Policy, which only they had the right to request under the Policy's terms. Likewise, Plaintiffs never asked or agreed to apply the accumulation value of their Policy toward premiums until exhaustion. Accordingly, AGLIC's unilateral actions were express breaches of the Policy.

**F.   AGLIC is Wrongfully Reducing the Cash Value of Plaintiffs' Policy to Zero; Refusing to Permit any Cash Value Build-Up in Plaintiffs' Policy; and Eliminating Plaintiffs' Tax-Free, Minimum Guaranteed Interest Rate of 4.5%, Compounded Annually**

79.     By letter dated December 11, 2017, AGLIC told Plaintiffs that "After the policy's accumulation value is exhausted, you may pay enough into the policy each year as necessary to maintain your coverage without building up any excess policy value."

80.     This letter by AGLIC makes it crystal clear that AGLIC will not allow Plaintiffs to maintain any cash value inside the Policy.

81.     AGLIC's wrongful acts have the effect of eliminating the critical investment component of the Policy: namely, the 4.5% tax-free minimum guaranteed interest rate - because that interest accrues only on the cash value built up inside the policy, and AGLIC is now preventing Plaintiffs from "building up any excess policy value."

82.     In addition, AGLIC's wrongful acts have the effect of eliminating a second critical component of the Policy which is the cash value – as the remaining cash value is rapidly depleted by AGLIC's forcible and unlawful partial surrender of the Policy and by AGLIC's refusal to allow any more premiums to ever be paid by Plaintiffs in excess of the annual costs of insurance.

83.     Through these wrongful acts, AGLIC has wrongfully converted Plaintiffs' Policy into the economic equivalent of a year-to-year term policy.

84.     One of the attributes of universal life insurance policies that is persistently marketed by AGLIC, is that by paying level premiums, the accumulation of a cash value helps to offset the higher costs of insurance in later years of the policy as the policyholder ages. The annual costs of insurance increase because the risk to AGLIC increases with age of the policyholder, pursuant to the mortality rates assumed by AGLIC. At older ages, these costs will undoubtedly become too expensive for Plaintiffs to afford, because AGLIC is prohibiting the accumulation of a cash value.

85.     AGLIC, for AGLIC's sole benefit, has deprived Plaintiffs of essentially all of the benefits of their "flexible premium" adjustable variable life insurance Policy (other than the bare year-to-year life insurance component).

86.     Plaintiffs have paid significant sums for their Policy and now it has been effectively eviscerated. Accordingly, AGLIC's unilateral actions constitute express breaches of the Policy.

## VI.   CLASS ALLEGATIONS

87.     Plaintiffs bring this action on behalf of themselves and all other similarly situated policyholders pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, as representatives of all members of the following Putative Class.

### Nationwide Class (Breach of Contract and Rescission)

### A.   Definitions

88.     Plaintiffs' breach of contract and rescission claims are brought on behalf of all AGLIC policyholders in the United States, their beneficiaries or estates, and their successors in interest, who:

    a)  purchased one or more life insurance products from AGLIC; and

    b)  were provided with one or more Illustrations and/or Annual Reports by AGLIC containing one or more statements as to periodic planned premiums remaining at the same dollar amount, and the policy remaining in effect, for a specified number of years; and

    c)  received notice from AGLIC in a letter, Policy Option Form, or other similar document (referred to hereinafter as a "DEFRA Notice"), advising, *inter alia*:

        1)  That the policy had exceeded its premium guideline limit, which had caused the policy to be out of compliance with current tax guidelines or federal regulations; or

        2)  That any additional payment of premium at the time of the DEFRA Notice would cause the policy to be out of compliance with current tax guidelines or federal regulations; or

        3)  That the policy was disqualified, or would be disqualified, as a contract of life insurance, because of the payment of premiums

22

which exceeded the maximum amount of allowable funds that may be paid into a policy; or

4) That such policyholder(s) could not pay premiums, or could no longer continue the policy on the same terms, as previously set forth in AGLIC's previous Illustrations and/or Annual Report(s); and also made reference to federal tax regulation(s) or law

89.    Excluded from the Class are:

a.    AGLIC, its parents, subsidiaries, affiliates, officers and directors; any entity in which AGLIC has a controlling interest; all customers of AGLIC who make a timely election to be excluded; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members;

b.    All AGLIC policyholders who executed a release of the claims contained in this Complaint; and

c.    Any AGLIC policyholders who received a DEFRA Notice on a date that is beyond the number of years provided for in the statute of limitations, considering all applicable discovery rules and statutes of repose, governing contract claims in the State of that policyholder's residence at the time the policy was issued.

**B.    Certification is Appropriate under Rule 23**

90.    This action has been brought and may be properly maintained on behalf of the Putative Class, as defined above, under Rule 23 of the Federal Rules of Civil Procedure. The requirements of Rule 23(a), 23(b)(2), and 23(b)(3) are all satisfied.

91.    The members of the Putative Class are ascertainable through the use of objective criteria. The identity of all of the members of the Putative Class is within the knowledge of AGLIC and can be readily ascertained by resort to AGLIC's records.

92.    Plaintiffs' claims satisfy Rule 23(a)(1), in that the members of the Putative Class are so numerous that joinder is impractical. Plaintiffs reasonably estimate that there are thousands of potential class members in this nationwide Putative Class.

4816-6024-0730, v. 1

93.     Plaintiffs' claims satisfy Rule 23(a)(2), in that there are numerous and substantial questions of law and fact common to all members of the Putative Class sufficient to satisfy Rule 23(a)(2). These common questions also predominate over any individual issues for purposes of Rule 23(b)(3), and Certification of the Class is therefore appropriate on that basis. The common issues include, but are not limited to:

a) Whether AGLIC anticipatorily repudiated and/or breached its contractual promises as to premiums remaining at the same dollar amount, and the policies remaining in effect, for a specified number of years;

b) Whether AGLIC anticipatorily repudiated and/or breached its contractual promises to allow the funds invested by Plaintiffs, and similarly situated policyholders, to continue to increase at a tax-free, guaranteed minimum interest rate, compounded annually;

c) Whether AGLIC misrepresented material facts in its Illustrations and/or Annual Reports as to premiums remaining at the same dollar amount, and the policies remaining in effect, for a specified number of years;

d) Whether AGLIC misrepresented material facts in its Illustrations and/or Annual Reports as to the funds invested by Plaintiffs and similarly situated investors increasing at the tax-free, guaranteed minimum interest rate, compounded annually;

e) Whether AGLIC anticipatorily repudiated, and/or repudiated, and/or breached, the contract it entered into with Plaintiffs and each of the similarly situated Class members;

f) Whether AGLIC's failure to correct "bugs" or "glitches" in its compliance systems resulted in numerous policies losing tax-advantaged status through no fault of the policyholders;

g) Whether AGLIC falsely and deceptively portrayed its failure, to accurately and/or timely calculate the implications of coverage and premium changes, as being caused by the policyholders and/or federal tax regulations;

h) Whether AGLIC unlawfully gave all affected policyholders a standardized policy option form containing choices for the policyholders that would all benefit AGLIC and harm policyholders;

24

i) Whether AGLIC's threats to policyholders that it would automatically exercise the option to surrender their policies amounted to an anticipatory breach and/or breach of contract;

j) Whether AGLIC's refusal to accept planned premiums, that AGLIC itself had agreed to, amounted to a breach of AGLIC's contracts with policyholders;

k) Whether AGLIC's issuance of partial surrender checks to policyholders, who did not request a surrender or a partial surrender, amounted to a breach of contract; and

l) Whether AGLIC's issuance of surrender checks to policyholders, who did not request a surrender, amounted to a breach of contract; and

m) The proper method or methods by which to measure damages.

94. Plaintiffs' claims satisfy Rule 23(a)(3), in that they are typical of the claims of the members of the Putative Class that Plaintiffs seek to represent. Plaintiffs and all members of the Putative Class are AGLIC policyholders, who claim that AGLIC harmed them through a common course of conduct. Specifically, upon information and belief, both the named Plaintiffs' claims and the claims of the Putative Class members involve:

a) The same or similar types of misrepresentations and knowing omissions made by AGLIC as to allowing a policy's cash value to continue to increase at a tax-free, guaranteed minimum interest rate (in Plaintiffs' case, 4.5% compounded yearly);

b) The same or similar types of misrepresentations and knowing omissions made by AGLIC in Illustrations and Annual Reports as to the agreed upon amount of planned premiums remaining at the same dollar amount, and a policy remaining in effect, for a specified number of years;

c) The same or similar assertions by AGLIC as to a policy being in violation of federal tax regulations and/or in potential violation of federal tax regulations (even though Plaintiffs and similarly situated Putative Class members merely paid premiums as agreed to or instructed by AGLIC);

d) The same failure by AGLIC to correct "bugs" and/or "glitches" in its tax compliance software for many years;

25

e) The same or similar portrayals by AGLIC that the problem was caused by the policyholders and not AGLIC; and

f) The same anticipatory repudiation, actual repudiation, and/or breach, of life insurance policy contracts.

95.     Plaintiffs satisfy Rule 23(a)(4), in that they will fairly and adequately represent and protect the interests of the members of the Putative Class they seek to represent. Plaintiffs have retained Counsel highly experienced in the handling of class actions and litigation against insurance companies. Counsel have the financial resources and are committed to prosecute this action vigorously. Neither Plaintiffs nor their Counsel have interests adverse to those of the Putative Class.

96.     In addition to Rule 23(b)(3), the Putative Class is also suitable for Certification under Rule 23(b)(2). AGLIC has acted on grounds generally applicable to the members of the Putative Class, thereby making final relief appropriate with respect to the Putative Class as a whole. The prosecution of separate actions by individual members of the Putative Class would create the risk of inconsistent or varying adjudications with respect to the individual members of the Putative Class that would establish incompatible standards of conduct for AGLIC. The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

97.     The representative Plaintiffs, like all members of the Putative Class, have been monetarily damaged by AGLIC's anticipatory repudiation and/or breach of contract in that AGLIC has failed and refused to fulfill its promises as to: a) accepting payments of the agreed-upon planned premiums;   b) agreed-upon planned premiums remaining at the same dollar amount, and the Policy remaining in effect, for a specified number of years; and/or c ) allowing the funds invested by Plaintiffs and similarly situated investors to continue to increase at the guaranteed annually compounded minimum interest rate.

98.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a)   Given the size of the claims of individual members of the Putative Class, as well as the resources of AGLIC, few class members, if any, could afford to seek legal redress individually for the wrongs alleged herein;

b)   This action will permit an orderly and expeditious administration of the claims of Putative Class members, will foster economies of time, effort, and expense, and will ensure uniformity of decisions;

c)   Any interest of Putative Class members in individually controlling the prosecution of separate actions is not practical, creates the potential for inconsistent or contradictory judgments, and would create a burden on the court system; and

d)   Without a class action, Plaintiffs and Putative Class members will continue to suffer damages, AGLIC's violations of law will proceed without remedy, and AGLIC will continue to reap and retain the substantial proceeds derived from their wrongful and unlawful conduct. Plaintiffs and the Putative Class members have suffered damages as a result of AGLIC's unlawful and unfair conduct. This action presents no difficulties that will impede its management by the Court as a class action.

99.     Notice can be accomplished by direct notice for most, if not all, members of the Putative Class, and targeted publication notice for the remainder.

## VII.   CLAIMS FOR RELIEF

### NATIONWIDE CLAIMS

### First Claim for Relief
### Breach of Contract

100.   Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

101.   In selling each universal life insurance policy, AGLIC entered into a contract as embodied in the Policy and related documentation.

102.   AGLIC anticipatorily repudiated that contract: a) when it sent its January 6, 2016 DEFRA Letter and Policy Option Form to Plaintiffs insisting that Plaintiffs agree to a modification of the Policy; and b) throughout 2016, when AGLIC sent letters to Plaintiffs continuing to insist that Plaintiffs agree to one of the modifications to the Policy contained in AGLIC's DEFRA Letter and Policy Option Form.

103.   AGLIC also breached the Policy by its failure and refusal to fulfill its contractual promise to allow Plaintiffs to continue to invest funds, by paying planned premiums, which would increase at the tax-free, guaranteed minimum interest rate of 4.5% compounded annually.

104.   AGLIC breached the Policy yet again when it sent Plaintiffs a check in the amount of $3,260, and asserted that this was a "partial surrender check." In fact, Plaintiffs never agreed to any surrender or partial surrender of the Policy.

105.   Under the Policy, only Plaintiffs have the right to surrender the policy for surrender value, or to make a partial surrender. AGLIC does not have any right to do so.

106.   With respect to the Putative Class, AGLIC repudiated and breached its contracts with the Putative Class members: a) by insisting that they agree to a modification of their

policies as set forth in AGLIC's standardized Policy Option Form; b) by sending checks to Putative Class members as purported "partial surrender checks" or "surrender checks;" and c) by AGLIC's failure and refusal to fulfill its contractual promise to allow Putative Class members to continue to invest funds, by paying premiums, that would increase at the tax-free, guaranteed minimum interest rate compounded annually.

107.    Plaintiffs and members of the Putative Class have performed all, or substantially all, of the obligations imposed on them under each of their contracts.

108.    Plaintiffs and the members of the Putative Class have sustained damages as a result of AGLIC's breach of contract.

**Second Claim for Relief**
**<u>Rescission</u>**

109.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

110.    AGLIC has insisted on making unilateral changes to the life insurance policies that it entered into with Plaintiffs and the members of the Putative Class. AGLIC had no right to implement any such unilateral modifications to these binding contracts.

111.    In doing so, AGLIC has anticipatorily repudiated these contracts.

112.    AGLIC's unilateral implementation of the surrender or partial surrender of the life insurance policies of Plaintiffs and other members of the Putative Class constitutes a repudiation of the contracts.

113.    AGLIC does not have any right under the contracts to surrender, or partially surrender, any of the life insurance policies of Plaintiffs or the members of the Putative Class.

114.    AGLIC's failure and/or refusal to accept  payment of planned premiums for the life insurance policies of Plaintiffs and the members of the Putative Class, in the amount, and/or

29

for the specified years, promised by AGLIC, is: a) essentially different from the performance promised by AGLIC; and b) therefore a repudiation and/or anticipatory repudiation of the contracts.

115.    Not receiving the benefit from AGLIC of the tax-free, guaranteed interest on the cash value of the policies owned by Plaintiffs and the members of the Putative Class is: a) essentially different from the performance promised by AGLIC; and b) therefore a repudiation and/or anticipatory repudiation of the parties' contracts.

116.    Due to the repudiation and/or anticipatory repudiation of their policies, Plaintiffs and the members of the Putative Class members are entitled to rescission of their policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the members of the Putative Class demand a jury trial on all claims so triable and judgment:

a) Declaring that Plaintiffs be designated representatives of the Class and that the undersigned be designated Class Counsel;

b) Declaring that AGLIC has repudiated, anticipatorily repudiated, and/or breached the contracts with Plaintiffs and the Class, and that Plaintiffs and each member of the Class are entitled to make an election of remedies to either: a) recover the amount of premiums previously paid; or b) enforce their contracts as written;

c) For compensatory damages;

d) For prejudgment interest at the maximum rate permitted by applicable law;

e) For costs and disbursements incurred by Plaintiffs, the Class and Class Counsel in connection with this action, pursuant to applicable law; and

f) For such other and further relief, including injunctive relief, as this Court deems just and proper.

*s/Martin P. Schrama*

By Martin P. Schrama, Esq.

**STARK & STARK, P.C.**

993 Lenox Drive, Building Two

Lawrenceville, New Jersey 08648

609-896-9060

Martin P. Schrama, Esq.

Craig S. Hilliard, Esq.

Stefanie Colella-Walsh, Esq.

Email: mps@stark-stark.com

csh@stark-stark.com

scw@stark-stark.com


*s/Scott B. Gorman*

By Scott B. Gorman, Esq.

**GORMAN & GORMAN, LLC**

Liberty View, Suite 400

457 Haddonfield Road

Cherry Hill, NJ 08002

856-665-4300

Scott B. Gorman, Esq.

Email: sgorman@gormanlegal.com

*Attorneys for Plaintiffs and Proposed Class*

31

## **DEMAND FOR A TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues and defenses.

*s/Martin P. Schrama*
By Martin P. Schrama, Esq.
**STARK & STARK, P.C.**
993 Lenox Drive, Building Two
Lawrenceville, New Jersey 08648
609-896-9060
Martin P. Schrama, Esq.
Craig S. Hilliard, Esq.
Stefanie Colella-Walsh, Esq.
Email: mps@stark-stark.com
csh@stark-stark.com
scw@stark-stark.com

*s/Scott B. Gorman*
By Scott B. Gorman, Esq.
**GORMAN & GORMAN, LLC**
Liberty View, Suite 400
457 Haddonfield Road
Cherry Hill, NJ 08002
856-665-4300
Scott B. Gorman, Esq.
Email: sgorman@gormanlegal.com

*Attorneys for Plaintiffs and Proposed Class*

## <u>LOCAL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Rule 11.2, it is hereby stated that the matter in controversy is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding to the best of our knowledge and belief.

<u>*s/Martin P. Schrama*</u>
By Martin P. Schrama, Esq.
**STARK & STARK, P.C.**
993 Lenox Drive, Building Two
Lawrenceville, New Jersey 08648
609-896-9060
Martin P. Schrama, Esq.
Craig S. Hilliard, Esq.
Stefanie Colella-Walsh, Esq.
Email: <u>mps@stark-stark.com</u>
          <u>csh@stark-stark.com</u>
          <u>scw@stark-stark.com</u>

<u>*s/Scott B. Gorman*</u>
By Scott B. Gorman, Esq.
**GORMAN & GORMAN, LLC**
Liberty View, Suite 400
457 Haddonfield Road
Cherry Hill, NJ 08002
856-665-4300
Scott B. Gorman, Esq.
Email: <u>sgorman@gormanlegal.com</u>

*Attorneys for Plaintiffs and Proposed Class*

Dated: January 3, 2018

33