### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

---

DUANE BUCK and ANN BUCK, on
behalf of themselves and all
others similarly situated,

         Plaintiffs,

    v.

AMERICAN GENERAL LIFE
INSURANCE COMPANY,

        Defendant.

No. 1:17-cv-13278-NLH-KMW

**OPINION**

---

**<u>APPEARANCES</u>:**

SCOTT B. GORMAN
GORMAN & GORMAN, ESQS.
LIBERTY VIEW
457 HADDONFIELD ROAD
SUITE 400
CHERRY HILL, NJ 08002-2220

CRAIG S. HILLIARD
STEFANIE LYNN COLELLA-WALSH
MARTIN P. SCHRAMA
STARK & STARK, PC
PRINCETON PIKE CORPORATE CENTER
993 LENOX DRIVE - BUILDING TWO
PO BOX 5315
LAWRENCEVILLE, NJ 08648

    *Attorneys for Plaintiffs Duane Buck and Ann Buck.*

ANDREW P. FISHKIN
ZACHARY WINTHROP SILVERMAN
FISHKIN LUCKS LLP
The Legal Center
One Riverfront Plaza, Suite 410
NEWARK, NJ 07102

    *Attorneys for Defendant American General Life Insurance
    Company.*

**HILLMAN**, District Judge

This case is a putative class action alleging the breach of universal life insurance policies.  Presently before the Court is the motion of Plaintiffs Duane and Ann Buck to certify two proposed classes and appoint class representatives and class counsel, which Defendant American General Life Insurance ("AGLIC") has opposed.  For the reasons expressed below, Plaintiffs' motion will be denied.

**BACKGROUND**

The Court has previously laid out many of the relevant facts in its earlier October 31, 2018 Opinion.  (ECF No. 25). However, as many of the facts that were relevant in that Opinion remain relevant for the purposes of considering the pending motion for class certification, that Court will re-state those facts needed for its current analysis, and will add those additional necessary facts that have been further introduced through the parties' briefing on the present motion.

In 1984, Plaintiffs Duane and Ann Buck purchased a universal life insurance policy (the "Buck Policy") on the life of Duane Buck with his wife, Ann Buck, as an additional insured. The Buck Policy was issued by The Old Line Life Insurance Company of America, a company later acquired by Defendant AGLIC.

Universal life insurance is a form of permanent life insurance, also known as flexible premium or adjustable life

2

insurance.  This refers to the fact that a policy is for a term of years with a set periodic premium, but the premium, benefits, and beneficiaries may all be modified during the term of years. Universal life insurance policies have a cash account, from which any charges or expenses associated with the insurance policy are deducted; as policyholders pay their set periodic premium, any amount paid via set premium that exceeds the cost of the policyholder's insurance and other expenses remains in the account, accruing a guaranteed minimum interest.  The money in this account is granted a tax-deferred status.

This type of insurance is meant to give a policyholder coverage for her entire lifetime, while allowing her to vary premium payments, adjust death benefits, and build a cash value while young to offset the higher premiums charged later in life. In other words, as Plaintiffs explain, this type of policy has three elements: (1) the premium, payable periodically, (2) the death benefit, payable to the beneficiary upon death of the insured, and (3) the cash surrender value, the value the policyholder receives if the policy is surrendered prior to death.  The cash value built up in the policy receives preferred tax treatment and may be used to pay the cost of insurance in place of a premium, to borrow money against the policy, or merely saved to build cash value.

These types of policies are governed, in part, by the Internal Revenue Code.  Section 7702, codified as part of the Deficit Reduction Act of 1984 ("DEFRA"), provides an outer limit for the amount of cash value that may accrue within a policy while still qualifying for preferred tax treatment.  See I.R.C. § 7702, et seq.  If the cash value exceeds this outer limit, a policy may lose preferred tax treatment as "life insurance." When it appears that an account may be approaching losing its preferred tax treatment, AGLIC sends the policyholder a DEFRA violation notice, generally informing her that her ability to make premium payments has been limited so as to avoid accruing a greater cash value than permitted under § 7702.

Initially, the Buck Policy provided a $70,000 death benefit for Duane Buck, a $25,000 rider for Ann Buck, and three $5,000 riders, one for each of the couple's children.  The Policy guaranteed an interest rate of 4.5%, compounded yearly, for all premiums paid in excess of cost.  The Policy also grants Plaintiffs the right to effectuate a partial or total surrender of the Policy at certain points with certain predetermined fees. AGLIC also provided "Annual Reports" which show the policy's current death benefit, current cash value, total amount of premiums paid, total accumulated growth, and total charges assessed.  As the name suggests, the Policy promises that these Annual Reports would be sent – at least - on a yearly basis.

4

Importantly, the Policy also states that "The Disclosure Statement which was delivered with this policy shows how long coverage will continue on the basis of current and guaranteed assumptions. The Annual Report sent to the Owner each year will update this information."  (ECF No. 8-1, Ex. A at 1).  Finally, the Policy states that if the Bucks pay a set fee and make a request in writing, AGLIC "will provide an illustration of future death benefits and cash values.  The illustration will be based on necessary assumptions specified by us and/or the owner. This includes assumptions as to specified amount, coverage options and future premium payments."  Id. at 9.

At some point later, Plaintiffs increased Duane Buck's death benefit to $100,000 and Ann Buck's death benefit to $50,000.  In 2008, Plaintiffs requested that AGLIC reduce the death benefit for both Duane and Ann Buck to $25,000 and that it eliminate the $15,000 in riders the couple had maintained for their children.  AGLIC complied.  In connection with the 2008 decrease in death benefit, the Bucks requested, and AGLIC provided, a "Supplemental Illustration" (the "Illustration") dated September 29, 2008.  The Illustration provides policyholders with projections to help them decide how desired changes to their policy may affect the ability of their investment to grow while maintaining preferred tax status. Plaintiffs allege the Illustrations provided by AGLIC determined

5

the amount of yearly or monthly premiums they paid.  The Bucks appear to have not paid their premium in 2009, although they argue that this was the fault of Defendant, and that the necessary amount of money as defined by the Planned Premium was withdrawn as a late payment.

On January 7, 2016, AGLIC sent Plaintiffs a letter which claimed the Policy had been funded to its limit and was at risk of losing its preferred tax status.  Defendant, in this letter, claimed that it was a combination of the decrease in death benefits and premium amount which led to this compliance issue. Plaintiffs allege that the reason the Policy was at risk of losing its preferred tax status was because Defendant used faulty compliance procedures and software which failed to adequately predict the amount of premiums required to keep the Policy tax compliant throughout its life, and provided them inaccurate information on this front in both the Illustration and their Annual Reports.

While AGLIC does not concede that the Bucks are correct as to the cause of their DEFRA violation, it does acknowledge that the company has discovered that their Illustration "erroneously did not account for the" impact the changes to their policy would have on their tax-deferred status.  (See ECF No. 74 at 15).  This issue was apparently caused by a "a software limitation in the relevant illustration system," which AGLIC has

acknowledged could cause Illustrations provided to policyholders in certain scenarios to fail to account for certain factors underlying the DEFRA compliance analysis, and therefore provide inaccurate information. Id.

AGLIC presented the Bucks with three options that would allow the Policy to maintain its tax status: (1) increasing the death benefit (which would have required additional underwriting), (2) surrendering the Policy, or (3) maintaining the Policy, allowing annual refunds, and ceasing premium payments until the cash value of the Policy was exhausted. AGLIC, in the letter, reserved the right to completely surrender the Policy if Plaintiffs did not choose one of the three listed options. Plaintiffs chose none of these options. AGLIC continued to send letters over the following year, reiterating the options available and that it reserved the right to unilaterally surrender the policy if no option was chosen.

On January 13, 2017, AGLIC sent a letter stating (1) the Policy remained non-compliant, (2) a check would be sent in the amount of $3,260 representing the amount the Policy was overfunded, and (3) the cash value of the Policy would be used to pay premiums until it had been exhausted, at which time Plaintiffs could resume paying premiums. Finally, on December 11, 2017 AGLIC sent a letter stating Plaintiffs "may pay enough

into the policy each year as necessary to maintain . . .
coverage without building up any excess policy value."

On December 19, 2017, Plaintiffs filed their complaint in
this Court, including class allegations.  Plaintiffs present two
claims for relief: breach of contract and recission.  Defendant
then filed both a motion to dismiss and a motion to strike the
class allegations on March 5, 2018.  This Court issued an
Opinion and Order granting in part and denying in part the
motion to dismiss and denying the motion to strike class
allegations.  In its opinion, the Court held that Plaintiffs
could move forward on certain of their theories of breach of
contract.

Most importantly for the current motion, the Court found
that Plaintiffs had adequately alleged that their Policy
obligated Defendant to send them (1) a yearly Annual Report that
contains certain information regarding the policy's current
amount, cash value, premiums paid, termination dates, and more,
and (2) an Illustration of Future Benefits and Values whenever
Defendant receives a written request and payment of a service
fee, which would include certain similar information.  The
Court, viewing the allegations in the light most favorable to
Plaintiffs, found that they had sufficiently alleged at the
pleadings stage that if the Annual Reports or Illustration

contained misrepresentations or omissions as to the information the Policy promised to include, that would constitute a breach.

After the parties engaged in extensive discovery, Plaintiffs then filed a motion to certify two classes on July 29, 2020. (ECF No. 68). Specifically, Plaintiffs seek to certify both a Damages Class and an Injunction Class, defined in both their Complaint and their initial moving brief as follows:

Damages Class

[A]ll AGLIC policyholders in the United States, their beneficiaries or estates, and their successors in interest, who:

a) purchased one or more life insurance products from AGLIC; and

b) were provided with one or more Illustrations and/or Annual Reports by AGLIC containing one or more statements as to periodic planned premiums remaining at the same dollar amount, and the policy remaining in effect, for a specified number of years; and

c) received notice from AGLIC in a letter, Policy Option Form, or other similar document (referred to hereinafter as a "DEFRA Notice"), advising, inter alia:

   1) That the policy had exceeded its premium guideline limit, which had caused the policy to be out of compliance with current tax guidelines or federal regulations; or

   2) That any additional payment of premium at the time of the DEFRA Notice would cause the policy to be out of compliance with current tax guidelines or federal regulations; or

   3) That the policy was disqualified, or would be disqualified, as a contract of life insurance, because of the payment of premiums which exceeded the maximum amount of allowable funds that may be paid into a policy; or

   4) That such policyholder(s) could not pay premiums, or could no longer continue the policy on the same terms, as

previously set forth in AGLIC's previous Illustrations and/or Annual Report(s); and also made reference to federal tax regulation(s) or law.

Injunctive Class

All AGLIC Universal Life insurance policyholders in the United States, their beneficiaries or estates, and their successors in interest, who are contractually entitled to receive an Illustration and/or Annual Report from AGLIC.

(ECF No. 68 at 16-17).

Defendants then filed a lengthy brief opposing Plaintiffs motion to certify these classes.  Seemingly in response to arguments raised by Defendants in their opposition brief, Plaintiffs' reply brief refined their class definitions by clarifying that only policyholders who were "contractually entitled" to "forward-looking" Annual Reports or Illustrations would qualify as class members: "the only potential Injunctive Class members are policyholders who are contractually entitled to receive a forward-looking AGLIC Illustration and/or Annual Report. In addition, the only potential Damages Class members are policyholders who: 1) were contractually entitled to and did receive a forward-looking AGLIC Illustration and/or Annual Report; 2) paid their current set Planned Premiums; and 3) still received a DEFRA Notice."  (ECF No. 83 at 9) (emphasis added).

Noting these changes, Defendant filed a letter requesting permission to file a sur-reply brief addressing both the specific impact of those changes on the motion to certify class,

as well as arguments raised by Plaintiffs' newly introduced expert.  The Court granted both parties permission to file further sur-replies addressing these additional questions, which both parties did.  (ECF No. 88 and 89).

The Court notes that Plaintiffs claim, both in a letter addressed to the Court and in their sur-reply, that they have not in fact changed their class definitions — specifically, they contend that their class definitions, despite not initially mentioning "forward-looking" Illustrations or Annual Reports and not explicitly stating that Damages Class members needed to be contractually entitled to receive an Illustration or Annual Report, actually were intended to incorporate the Court's explication of Plaintiffs' breach of contract claims in its October 31, 2018 Opinion.  The Court finds this argument unavailing.  Plaintiffs' initial Damages Class definition as proposed in their moving brief, for example, is unchanged from their complaint, and therefore could not have been intended to incorporate the Court's ruling on the motion to dismiss.

However, the Court also recognizes "the ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition." Weitzner v. Sanofi Pasteur, Inc., No. 3:11-CV-02198, 2017 WL 3894888, at *9 (M.D. Pa. Sept. 6, 2017) (quoting In the Matter of: Monumental Life Insurance Co., 365 F.3d 408, 414 (5th Cir.

2004)).  Federal Rule of Civil Procedure 23(c)(1) provides a mechanism for modification of class definition, and as such "[a] court is not bound by the class definition proposed in the complaint." Weisfeld v. Sun Chem. Corp., 84 F. App'x. 257, 259 (3d Cir. 2004) (citing Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir. 1993)).  Importantly, courts have allowed Plaintiffs to substantially modify proposed class definitions initially set forth in their Complaint throughout the course of litigation. See, e.g., Gates v. Rohm & Haas Co., 265 F.R.D. 208, 215 n.10 (E.D. Pa. 2010) (citing Robidoux, 987 F.2d at 937) (noting that Plaintiffs were permitted to substantially modify the proposed class definition in their reply brief); see also In re Thalomid and Revlimid Antitrust Litig., No. 14-6997, 2018 WL 6573118, at *2 n.1 (D.N.J. Oct. 30, 2018) (analyzing class definitions as refined and amended in plaintiffs' reply brief).

Further, as the Court has permitted both parties to file sur-reply briefs addressing these changes and putting forth additional arguments regarding the propriety of certification of the proposed classes as amended, it finds that Defendant has not been prejudiced by Plaintiffs' actions in amending their class definitions in their reply brief.  Accordingly, the Court, in analyzing the present motion to certify class, will incorporate Plaintiffs' newly added requirements that class members be

contractually entitled to receive a forward-looking Illustration
or Annual Report.

## DISCUSSION

### I.   Subject Matter Jurisdiction

This Court has jurisdiction over this action under the
Class Action Fairness Act of 2005.  See 28 U.S.C. § 1332(d)
(granting United States district courts jurisdiction over
putative class claims, which, in aggregate, exceed $5,000,000
and include one putative class member who is diverse from
defendants).  Plaintiffs are individual citizens of New Jersey
and AGLIC is a citizen of Texas having been incorporated there
and maintaining its principal place of business in that state.
Plaintiffs allege damages exceeding the statutory minimum.

### II.   Legal Standard for Motions to Certify Class

"The class action is 'an exception to the usual rule that
litigation is conducted by and on behalf of the individual named
parties only.'"  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338,
348, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) (quoting Califano
v. Yamasaki, 442 U.S. 682, 700-01, 99 S. Ct. 2545, 61 L. Ed. 2d
176 (1979)).  In order to justify a departure from the general
rule that each litigant proceeds with their own action, "a class
representative must be part of the class and possess the same
interest and suffer the same injury as the class members."  Id.
at 348-49 (quoting East Tex. Motor Freight System, Inc. v.

Rodriguez, 431 U.S. 395, 403, 97 S. Ct. 1891, 52 L. Ed. 2d 453 (1977)) (internal quotation marks omitted).

Every putative class action must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy.  City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc., 867 F.3d 434, 438 (3d Cir. 2017) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)).  In more detail, Rule 23(a) requires the movant to establish that:

    (1)  the class is so numerous that joinder of all members is
         impracticable;

    (2)  there are questions of law or fact common to the class;

    (3)  the claims or defenses of the representative parties are
         typical of the claims or defenses of the class; and

    (4)  the representative parties will fairly and adequately
         protect the interests of the class.

Fed. R. Civ. P. 23(a); Beneli v. Bca Fin. Servs., 324 F.R.D. 89, 95 (D.N.J. 2018).

The party "seeking class certification bear[s] the burden of establishing by a preponderance of the evidence that the requirements of Rule 23(a) have been met."  In re NFL Players Concussion Injury Litig., 821 F.3d 410, 426 (3d Cir. 2016) (quoting In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig., 795 F.3d 380, 391 (3d Cir. 2015)).

In addition to the Rule 23(a) requirements, a class action must be maintainable under Rule 23(b)(1), (2), or (3). Plaintiffs seek certification of two separate classes, a Damages Class under Rule 23(b)(3) and an Injunctive Class under Rule 23(b)(2).  Rule 23(b)(2) requires Plaintiffs to meet the additional requirement of cohesiveness, meaning that "the relief sought is appropriate for and will benefit the entire class." McNair v. Synapse Group, Inc. 2010 WL 4777483, at *7 (D.N.J. Nov. 15, 2010).

Rule 23(b)(3), on the other hand, requires Plaintiffs to meet the additional requirements of predominance and superiority.  City Select, 867 F.3d at 438-39 (citing Amchem, 521 U.S. at 615).  Under that subsection, a class must also be "currently and readily ascertainable based on objective criteria."  Id. at 439 (quoting Marcus v. BMW of N. Am. LLC, 687 F.3d 583, 593 (3d Cir. 2012)).  To satisfy this standard, Plaintiff must show that "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'"  Id. (quoting Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015)); Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013).  The district court must "undertake a rigorous analysis

of the evidence to determine if the standard is met." Id.
(quoting Carrera, 727 F.3d at 306).

### III. __Rule 23(a) Analysis__

The Court first finds that Plaintiffs have not satisfied
the Rule 23(a) factors by a preponderance of the evidence.

#### A. __Rule 23(a)(1): Numerosity__

Rule 23(a)(1) requires that a class be "so numerous that
joinder of all members is impracticable." In re NFL Players
Concussion Injury Litig., 821 F.3d at 426 (quoting Fed. R. Civ.
P. 23(a)(1)). "There is no magic number of class members needed
for a suit to proceed as a class action." Id. That said,
numerosity is generally satisfied if there are more than forty
(40) class members. Id. (citing Marcus v. BMW of N. Am., LLC,
687 F.3d at 595; Stewart v. Abraham, 275 F.3d 220, 226-27 (3d
Cir. 2001)).

Here, the numerosity requirement is clearly satisfied.
Plaintiffs note that Defendant's own estimates as to the number
of individuals that could be in the proposed classes are well
above the standard forty-class-members benchmark. Defendants do
not dispute this assertion, and do not argue that Plaintiffs
have not sufficiently demonstrated numerosity in either of their
opposition briefs. Accordingly, the Court finds that Plaintiffs
have satisfied this requirement.

B. **Rule 23(a)(2): Commonality**

Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "It is well established that only one question of law or fact in common is necessary to satisfy the commonality requirement, despite the use of the plural 'questions' in the language of Rule 23(a)(2)."  In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 597 n.10 (3d Cir. 2009); Wal-Mart Stores, Inc. v. Dukes, 564 U.S. at 359.  Thus, there is a "low threshold for satisfying this requirement."  Beneli, 324 F.R.D. at 97 (first citing Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183 (3d Cir. 2001) and then citing In re Sch. Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986)) (highlighting the low threshold for commonality).  Moreover, this requirement does not mandate that all putative class members share identical claims.  Hassine v. Jeffes, 846 F.2d 169, 176-77 (3d Cir. 1988).  "Even where individual facts and circumstances do become important to the resolution, class treatment is not precluded."  Beneli, 324 F.R.D. at 97 (quoting Baby Neal, et al. v. Casey, et al., 43 F.3d 48, 56 (3d Cir. 1994)).

Defendants again do not dispute that Plaintiffs have sufficiently demonstrated commonality, and the Court easily finds that they have.  The claims of all members of both classes, as defined in Plaintiffs' opposition brief, involve the

common question of law of whether Defendant's alleged failure to provide accurate information in the Annual Reports and Illustrations received by the class members constituted a breach of contract.  Accordingly, Plaintiffs have sufficiently met the low threshold for demonstrating commonality.

### C. **Rule 23(a)(3): Typicality**

While Plaintiffs have satisfied the first two requirements, the Court finds that they have failed to demonstrate typicality. "Rule 23(a)(3) requires that the class representatives' claims be 'typical of the claims . . . of the class.'" In re NFL Players Concussion Injury Litig., 821 F.3d at 427 (quoting Fed. R. Civ. P. 23(a)(3)).  This requirement "ensures the interests of the class and the class representatives are aligned 'so that the latter will work to benefit the entire class through the pursuit of their own goals.'"  Id. at 427-28 (quoting Newton, 259 F.3d at 182-83).  Slight factual differences will generally not preclude a finding of typicality where there is a "strong similarity of legal theories or where the claim arises from the same practice or course of conduct."  See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 311 (3d Cir. 1998) (internal citations omitted).

"[T]he typicality requirement is satisfied as long as representatives and the class claims arise from the same event or practice or course of conduct and are based on the same legal

theory." Beneli, 324 F.R.D. at 97 (citing Brosious v. Children's Place Retail Stores, 189 F.R.D. 138, 146 (D.N.J. 1999); Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 923 (3d Cir. 1992) ("Factual differences will not render a claim atypical if the claim arises from the same event or practice of course of conduct that gives rise to the claims of the class members, and it is based on the same legal theory.").

Specifically, the Third Circuit has viewed the typicality requirement as stating that "(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." In re Schering, 589 F.3d at 599.

Defendant here has challenged Plaintiffs' showing of typicality by arguing that Plaintiffs' claims are subject to unique individual defenses that render them not typical of the claims of all putative class members. On this front, "Defendant carries the burden to 'show some degree of likelihood a unique defense will play a significant role at trial.'" Barr v. Harrah's Entertainment, Inc., 242 F.R.D. 287, 292 (D.N.J. 2007)

(quoting <u>Beck v. Maximus, Inc.</u>, 457 F.3d 291, 300 (3d Cir. 2006)).

Defendant here emphasizes multiple unique defenses they think demonstrate a lack of typicality.  First, Defendant argues that the Bucks have not in fact been damaged by AGLIC's alleged breach of their policy.  However, Defendant only briefly waves at this argument in a short, two-sentence paragraph, apparently relying for the most part on its attempt to explain in its brief's statement of facts why the Bucks have not personally been damaged.  While the Court recognizes that Defendant has expounded at length on the potential issues many potential class members might face in showing that they have been damaged, those questions appear more properly suited for predominance analysis under Rule 23(b)(3) than they do the analysis of typicality under Rule 23(a)(3).  The Court finds that Defendant has simply not put forth sufficient evidence at this stage to show that the Bucks are individually subject to this unique defense themselves in such a way that it threatens to become the focus of the litigation.

Second, Defendant argues that the Bucks' claims are not typical because any damages they might have suffered were self-inflicted and caused by their own actions in minimally funding their policy for years and then materially decreasing coverage in 2008.  But Defendant's attempt to portray these as on-point

defenses betrays a misunderstanding of Plaintiffs' argument at this stage in the litigation.  As described above, Plaintiffs have revised their class definitions to only encompass those policyholders that followed their planned premiums. Accordingly, their theory appears to be that, if a policyholder received an Illustration or Annual Report stating that their policy would remaining DEFRA compliant if they paid certain planned premiums and then they simply paid those premiums, then their actions prior to receiving the Illustration or Annual Report — which would presumably be factored into the information provided by AGLIC — should not cause a plan to violate DEFRA in the future.  While the Court makes no decision on the merits of this argument, it does find given this apparent refinement of Plaintiffs' theory of liability, Defendant has again failed to show that these proposed defenses are likely to become a major focus in this litigation.

However, Defendant has put forth two separate, but interrelated defenses that show the atypicality of the Bucks' claims.  First, Defendant points out that after the Bucks reduced their coverage following the request for the September 29, 2008 Illustration, there were no premium payments made on their account for the entirety of 2019, requiring a back payment

of the full amount at one time — a fact that Plaintiffs admit.[1]

(ECF No. 79 at ¶¶ 52-55; ECF No. 83-3, Ex. A at ¶ 17).  As

Defendant's expert notes, "[e]ven minor differences between

actual and planned premiums — with respect to the timing,

frequency, or amount — can have significant consequences on

funding limits under IRC section 7702."  (ECF No. 88-6 at ¶ 27).

Accordingly, the information and forecasts provided in the

Illustrations AGLIC sends policyholders upon request are

extremely dependent on the policyholder following the prescribed

planned premiums to the letter, and on a multitude of other

factors remaining consistent.

Defendant therefore asserts that the extended period in

which the Bucks did not pay their premiums could well cut the

causal chain between the inaccurate Illustration and any damages

they may have suffered.  This argument does make sense:

Plaintiffs' own expert appears to acknowledge that even small

changes can dramatically impact the potential DEFRA compliance

of a policy, (see ECF No. 89-9, Ex. F at ¶ 27), and since the

---

[1] The Court recognizes that Plaintiffs have introduced evidence
purporting to demonstrate that the blame for any delay in the
payment of their premiums lies at the feet of AGLIC.  However,
even if the Bucks are correct and they were to defeat this
defense later in this litigation, the question at this stage is
not whether a unique defense will ultimately prevail — it is
whether the unique defense is substantial enough to raise the
risk that its adjudication will dominate this litigation to the
detriment of the claims and arguments that are common to the
class at large.

extra premium amounts paid and stored in the Buck's cash account earn 4.5% interest, paying their premiums late and all at once could potentially throw off the calculations underlying the 2008 Illustration.

Of course, Plaintiffs would likely counter that these changes should then have shown up in their Annual Reports, warning them of potential DEFRA violations in the future. Defendant, however, has additionally argued that Plaintiffs' claims are atypical and further subject to unique defenses regarding whether the Bucks' Annual Reports could have caused their alleged damages based on their own failure to read and understand the reports.  As Defendant points out, Duane Buck has admitted he did not read his Annual Reports. (ECF No. 78-14 at 81:6-8).  Ann Buck has also conceded that while she read some reports, she did not read each Annual Report that the Bucks received; and, importantly, she explicitly acknowledged that "I think that we looked at them all, but didn't understand them. So we didn't look at them close enough, I guess."  (ECF No. 78-15 at 90:10-23).  Given the fact that causation is a central element of any breach of contract claim, questions regarding the individual factual circumstances underlying the Bucks' claim very well may become central at trial.

While the Court makes no finding on the merits regarding these defenses at the class certification stage, it does find

that they appear substantial enough to provoke concern that "the representative's interests might not be aligned with those of the class, [or] the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class."   Beck, 457 F.3d at 297.

Simply put, Defendant has successfully demonstrated that Plaintiffs may in fact be subject to unique defenses regarding their own failure to follow the planned premiums outlined in the 2008 Illustration, and whether they actually read or understood their Annual Reports to a sufficient degree for those reports to have caused them damage.  As Plaintiffs' own class definitions and theory of liability are reliant on the idea that most class members read and understood their Annual Reports or Illustrations and then followed them closely, Plaintiffs have failed to meet their burden to demonstrate that their claims are typical of the claims of the class they seek to represent. Class certification therefore must be denied as to both the Damages Class and the Injunctive Class.

### D. **Rule 23(a)(4): Adequacy**

Had Plaintiffs sufficiently demonstrated typicality, the Court finds that Duane Buck has met the adequacy requirement of Rule 23(a)(4).  A class may not be certified unless the representative class members "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4); Beneli,

324 F.R.D. at 98.  Rule 23(a)(4)'s adequacy requirement "has two components designed to ensure that absentees' interests are fully pursued." In re Schering, 589 F.3d at 602.  "First, the adequacy inquiry 'tests the qualifications of the counsel to represent the class.'" Id. (quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004)). Here, no issue has been raised regarding the adequacy of Plaintiffs' counsel, and Plaintiffs' have demonstrated that their counsel has substantial experience in both class actions and breach of contract claims in the insurance context and have devoted significant time and effort to this action.  (See generally ECF No. 68-1, 69-1, and 69-7).

"The second component of the adequacy inquiry seeks 'to uncover conflicts of interests between named parties and the class they seek to represent.'" Id. (quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d at 532).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." In re NFL Players Concussion Injury Litig., 821 F.3d at 431 (quoting Amchem, 521 U.S. at 625).  "The 'linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class.'" Id. (quoting Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 183 (3d Cir. 2012).  However,

25

a class representative must also represent a class capably and diligently.  "[A] minimal degree of knowledge" about the litigation is adequate.  Id. at 430 (quoting New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007)) (internal quotation marks omitted).

Here, Defendant raises two central arguments for why it believes Plaintiffs have failed to demonstrate that the Bucks are adequate class representatives: (1) Ann Buck is not a member of the proposed class, and (2) Duane Buck is unfamiliar with their claims.  On the first point, Defendant cites the Court to the deposition testimony of Ann Buck.  There, in response to the question "Who do you understand is the owner of that policy," she replied, "I guess my husband."  (ECF No. 78-15 at 16:17-20).  She then went a step further and explained, in response to being asked "Why do you think your husband is the owner of the policy," that "I think I was listed as a rider and not the owner, so.  But I'm not positive about it."  (Id. at 16:22-17:3).

Plaintiffs in response argue that the Bucks' policy applications make clear that both Duane and Ann are owners of the policy.  They note that the Bucks' policy states that "The owner is as shown in the Application unless changed," (ECF No. 83-18, Ex. 12), and the Application forms submitted by the Bucks state that "The Proposed Insured shall be the policy owner

unless another owner is named above."  (ECF No. 83-18, Ex. 18).

Plaintiffs then contend that the Applications the Bucks filed

list Duane as the Proposed Insured on one form and Ann as the

Proposed Insured on the other.

The Court's review of the Application forms attached as

exhibits and cited to by Plaintiffs, however, reveals that both

forms in fact list Duane Buck as the Proposed Insured, include

his signature on the line for the Proposed Insured, and, under

Section 6.D for ADDITIONAL COVERAGES, lists "OIR on Ann Marie

Buck wife 25,000" – meaning that Ann's coverage was being

provided as an "other insured" rider to the policy owned and

opened by Duane.  Id.  This fact is only further confirmed by

the copy of the Policy itself that the Bucks attached to their

complaint, which explicitly lists $25,000 of coverage for Ann

Marie Buck as a "RIDER" and "OTHER INSURED" on the policy taken

out by Duane.  (See ECF No. 8-1, Ex. A at 20).  The documents

cited to by Plaintiffs simply do not support their factual

contention, and instead make clear that the owner and

policyholder of the policy in question here is Duane Buck.

Accordingly, the Court finds that Plaintiffs have failed to

demonstrate by a preponderance of the evidence that Ann Buck is

a member of the classes they seek to have certified and an

adequate representative of those classes.

The remaining question on this factor is then whether the Duane Buck is familiar enough with the claims in this action to serve as an adequate class representative.  While Defendant is correct that Duane Buck's deposition transcript does not appear to demonstrate a deep, detailed understanding of this litigation, the Court finds that he is not so unknowledgeable as to be an inadequate class representative.  First, Mr. Buck did provide an accurate, if highly simplified, explanation of what a class action is.  (ECF No. 78-14 at 21:1-4).  Second, contrary to Defendant's assertion that he believed his claims were based on a misrepresentation made in 1984, he responded to a question to that effect by stating "No, we're misled now.  We weren't misled back then."  Id. at 26:7-14.  He further made explicitly clear that he understood the basis of the Bucks' claims to be that they were misled "[t]hat our insurance would last till around 2040.  And now they're saying it's only going to last to 2023" — again, a highly simplified, but generally accurate description of the most basic, underlying allegation here.  Id. at 22:15-17.

While these answers do not demonstrate a sophisticated understanding of the complex details involved in this case, they do not have to.  As the Third Circuit has repeatedly made clear, the real focus of the adequacy requirement is on whether there is some serious conflict of interest between the proposed

representative and the rest of the class members, and a class representative need only have a "minimal degree of knowledge." New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007) (quoting Szczubelek v. Cendant Mortgage Corp., 215 F.R.D. 107, 119 (D.N.J. 2003)).  Here, given the fact that Duane Buck is ably represented by a team of highly experienced attorneys with substantial practices in both class actions and insurance-related litigation, the Court will not find him to be an inadequate representative.  See Barr, 242 F.R.D. at 295 ("[A] class representative need not be intimately familiar with the legal theory behind his claims since he is represented by adequate counsel.").

## IV.  **Rule 23(b)(3) Analysis**

While the Court's finding that the named Plaintiffs' claims are not typical of the claims of their proposed classes is sufficient on its own to deny the present motion for certification, the Court further finds that Plaintiffs' proposed Damages Class poses numerous additional difficulties under Rule 23(b)(3).  For the sake of thoroughness, the Court will further address those concerns.

After Rule 23(a) is satisfied, a plaintiff must establish that the proposed class also satisfies Rule 23(b).  For class certification under Rule 23(b)(3), the Court must find not only that (1) "questions of law or fact common to class members

29

predominate over any questions affecting only individual members," and (2) that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy," (Fed. R. Civ. P. 23(b)(3); see Beneli, 324 F.R.D. at 99), but also that the class is "currently and readily ascertainable based on objective criteria." Marcus v. BMW of North America, LLC, 687 F.3d 583, 593 (3d Cir. 2012). In this case, the Court finds that both the predominance and ascertainability elements counsel against class certification, and therefore declines to address the question of superiority.

## A. **Predominance**

Predominance requires "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). In determining whether common questions predominate, courts have focused on the claims of liability alleged against defendants. See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." In re NFL Players Concussion Injury Litig., 821 F.3d at 434 (citation omitted).

As this Court stated in its October 31, 2018 Opinion on Defendant's motion to dismiss, in order to properly plead a breach of contract claim, Plaintiffs must show "(1) the

existence of a valid contract between the parties; (2) failure
of the defendant to perform its obligations under the contract;
and (3) a causal relationship between the breach and the
plaintiff's alleged damages."  (ECF No. 25 at 12) (quoting
Motamed v. Chubb Corp., 15-cv-7262, 2016 U.S. Dist. LEXIS 33301,
at *11-12 (D.N.J. Mar. 15, 2016)).  Defendant's opposition brief
largely focuses on the predominance factor, devoting a
substantial number of pages to its numerous arguments for why
individual questions would predominate over common questions in
any attempt to determine, on a class-wide basis, whether breach
of contract has been proven.

    The Third Circuit has "previously noted that the line
dividing ascertainability from predominance is blurry."  Hayes
v. Wal-Mart Stores, Inc., 725 F.3d 349, 359 (3d Cir. 2013)
(citing Marcus, 687 F.3d at 594 n. 3).  While the two concepts
do conceptually overlap, "they remain separate prerequisites to
class certification and serve distinct purposes: the
ascertainability requirement focuses on whether individuals
fitting the class definition may be identified without resort to
mini-trials, whereas the predominance requirement focuses on
whether essential elements of the class's claims can be proven
at trial with common, as opposed to individualized, evidence."
Id. (internal citations omitted).  Here, the Court first finds
that Defendant's predominance objections based on the potential

need for individualized inquiries regarding the specifics terms of individual contracts, whether individual policyholders experienced breach of their policy, and whether such breach caused any alleged damages "all focus on whether putative class members fit the class definition" and thus are "better analyzed under the ascertainability framework than the predominance framework."  Id.

First, Defendant's opposition brief argues that predominance has not been shown because individualized review would be necessary as to the terms of each potential class member's specific policy, so as to analyze and determine whether incorrect information in an Annual Report or Illustration could even constitute a breach of that policy's terms.  While this may initially have been a powerful argument that analysis of individual evidence would predominate over class-wide evidence, Plaintiffs' revision of its class definitions appears to have resolved this potential issue.

In their reply brief, Plaintiffs' specified that their Damages Class would only include those policyholders that were contractually entitled to receive an Annual Report or Illustration showing forward-looking information regarding their policies, under the theory of breach that this Court explained in detail in its earlier Opinion permitting Plaintiffs' claims to move past the pleadings stage.  While, as Defendants argue

elsewhere, this new definition may simply create additional concerns regarding whether the members of the proposed Damages Class are easily ascertainable, the Court finds that the revised definition clears up this potential question regarding the predominance element.  Simply put, if each class member, by definition, was contractually required to have received the forward-looking information in question in their Annual Reports or an Illustration, then individual evidence regarding whether the terms of the class members' contracts entitled them to such information should certainly not predominate at trial.

Defendant, in its sur-reply brief, further notes that some of AGLIC's policies require Annual Reports or Illustrations to further include "any other data required by the state in which the policy is delivered," and argues that accordingly the Court would need to further analyze the specific language of the contract and state law to determine which information was required to be included.  However, Defendant has overcomplicated the question at the heart of this case: Plaintiffs' central argument is that if class members were contractually entitled to forward-looking Illustrations or Annual Reports, and the information in those Illustrations or Annual Reports was inaccurate, that alone is sufficient to demonstrate breach. While individual state laws could theoretically provide for yet another potential form of liability for breach for those

policyholders whose policies required incorporation of
additional data under state law, analysis of that issue is
separate and distinct from the theory of liability at the center
of this litigation.

Similarly, Plaintiffs' revision of their Damages Class
definition to only incorporate those policyholders who "merely"
or "materially" paid their planned premiums as outlined in the
Illustration or Annual Report similarly shifts Defendant's
arguments regarding breach and causation from being questions of
predominance to being questions of ascertainability.  While
Defendant has continued to assert that there are individual
questions as to these factors that predominate over common
questions, it appears they have overcomplicated Plaintiffs'
theory of breach in doing so.

With the Damages Class definition revised to include only
those policyholders who paid their planned premiums and made no
other changes, Plaintiffs' theory as to how breach and causation
can be shown on a class-wide basis is both interconnected and
simpler than Defendants make it out: if a policyholder (1)
received an Illustration or Annual Report that outlined a
specific planned premium and appeared to forecast that the
policy would continue as expected and not fall into a DEFRA
scenario, and the policyholder (2) did *nothing else* besides pay
the planned premiums set out in the Illustration or Annual

Report, with no changes made to the policy or coverage, then (3) the policyholder could not have received a DEFRA notice unless the information in the Illustration or Annual Report was inaccurate.  (See ECF No. 83-3 at ¶ 33).  And, as Plaintiff notes, an individual policyholder's actions prior to the reception of the Illustration or Annual Report are beside the point — if actions taken prior to when AGLIC generated a policyholder's forward-looking information regarding planned premiums and termination dates may have caused a DEFRA scenario, then one would assume that the Illustration or Annual Report would have identified that concern, thereby giving the policyholder an opportunity to take steps to avoid such a scenario before it arose and before a DEFRA Notice was necessary.

Therefore, Defendant's arguments that individual inquiry on these fronts will be necessary is not truly a question of predominance.  Rather than undermining Plaintiffs' ability to show that essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence, Defendant's arguments here call into question whether the Court will be able to readily ascertain who is a policyholder that "merely" or "materially" followed the planned premiums as Plaintiffs' class definition requires.  The Court will address these concerns in its ascertainability analysis instead.

However, while those questions may be better suited for the ascertainability analysis, Defendant has raised a genuine concern regarding whether the damages prong of Plaintiffs' breach of contract claim can be proven at trial through common, as opposed to individualized, evidence.  Plaintiffs, in their reply briefs, point out that "individual damages calculations do not preclude class certification under Rule 23(b)(3)," Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 375 (3d Cir. 2015), and appear to focus their counter arguments on the reasons why they believe they have shown sufficient, valid methods for calculating individual policyholder's damages, or for resorting to rescission in cases where such damages may be impossible to properly calculate.

However, as the Third Circuit has previously explained, "when courts speak of 'damages,' they are often referring to two distinct concepts: the 'fact of damage' and the measure/amount of damages."  Harnish v. Widener University School of Law, 833 F.3d 298, 305 (3d Cir. 2016).  Plaintiffs' contention regarding damages calculations is accurate.  But "the putative class must first demonstrate . . . the fact of damage [] 'on a common basis.'"  Id. at 306 (quoting Newton, 259 F.3d at 189).

While Defendant has separately raised arguments regarding the ability to calculate individual damages, Plaintiffs appear to have largely ignored the question raised as to whether they

can prove such fact of injury for all class members.  Breach of
contract claims require the plaintiff to have suffered damage.
Red Roof Franchising, LLC v. Patel, 877 F. Supp. 2d 124, 131
(D.N.J. 2012).  The question here then is whether the Damages
Class would be able to prove this element — namely, that class
members were damaged by the allegedly inaccurate information
provided in their Annual Report or Illustration — through the
introduction of evidence at trial that is common to the class,
rather than requiring "individualized evidence [that will] later
overwhelm the case and render it unsuitable for class-wide
adjudication."  Id. at 305.

In determining whether issues that are 'susceptible to
generalized, class-wide proof' are 'more prevalent or
important,' a district court is called to 'formulate some
prediction as to how specific issues will play out ... in a
given case.'"  Id. at 304 (quoting In re Hydrogen Peroxide
Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008)).  While a
court's analysis under this standard may sometimes appear close
to a merits determination, it is not one — the Court's duty at
this stage is not to make a final determination regarding
whether Plaintiffs can prove any element of their breach of
contract claim, but to assess whether "the plaintiffs' proposed
class-wide theories and evidence would be sufficient to address
the predominant issues in the case," or if there is a serious

37

risk that individual issues will ultimately predominate at trial. Id. at 305.

Here, Defendant argues that Plaintiffs simply cannot show fact of injury on a class-wide basis. AGLIC's basic explanation is simple: many policyholders who have received a DEFRA notice have not actually suffered damage as a result of receiving a DEFRA notice. To properly explain and assess the first of Defendant's arguments on this front, the Court finds it necessary at this stage to outline a further dispute between the parties regarding the specific factual circumstances faced by different policyholders who have received DEFRA notices.

Defendant and its experts have asserted in this action that the group of policyholders that have received DEFRA notices under Plaintiffs' Damages Class definition can and should be conceptually split into two separate groups: those who have received so-called "Temporary" DEFRA Notices and those who have received "Permanent" DEFRA Notices. According to Lana Marquette, Vice President and Head of Decision Support for AGLIC, DEFRA compliance is monitored by keeping track of the Guideline Premium Limitation ("GPL"), which is "essentially a legal limitation on the amount of premiums that can be paid into a universal life policy" based on a series of factors that are not relevant to this analysis. (ECF No. 79 at ¶ 12).

Marquette, as well as Brian King, Managing Director in the
Insurance and Actuarial Advisory Services Practice of Ernst &
Young LLP's Financial Services Office, explain that, in general,
a Temporary DEFRA Notice will be sent to a policyholder who
attempts to make a premium payment that would cause their
cumulative premium payment amount to exceed the GPL.  In the
Temporary DEFRA scenario, the account remains tax-advantaged
life insurance, but policyholders may be prohibited from
contributing more premiums for a temporary period, and AGLIC
sends the policyholder a letter "stating that the payment cannot
be made and that payments must be temporarily limited, usually
to the next policy anniversary." (Id. at ¶¶ 14-16; ECF No. 80
at ¶ 51).

A Permanent DEFRA Notice, on the other hand, is generally
sent to a policyholder when "a significant reduction in
coverage" is made, which reduces GPL amount on a yearly basis
until it eventually falls below the cumulative amount of
premiums already paid by the policyholder.  (ECF No. 79 at ¶
14).  Therefore, for the policy to remain tax-advantaged life
insurance, policyholders are not only restricted from paying
future premiums, but excess premiums in the cash account, if
any, must be refunded to the policyholder each year commensurate
with each decrease in the GPL.  (Id. at ¶ 16; ECF No. 80 at ¶¶
54-55).  When this occurs, AGLIC "sends the policyholder a

39

letter advising that payments are permanently limited and providing the policyholder various options." (ECF No. 79 at ¶ 15).

Plaintiff, unsurprisingly, has disputed this distinction, referring to AGLIC's "unavailing" "attempt to create two fabricated terms in order to create distinction between them." (ECF No. 89 at 17). And their own expert has similarly disagreed with the explanations of Defendant's experts, stating that "IRC §7702 does not make any such distinction," and that "I contend, a violation is a violation." (ECF No. 89-9, Ex. F. at ¶¶ 24-25).

At this point, it is worthwhile to re-state the burden of persuasion present on a motion to certify class: Plaintiffs here bear the burden of demonstrating, by a preponderance of the evidence, that common issues predominate in this litigation over individual issues of specific class members. If Plaintiffs cannot show under that standard that this distinction either does not exist, or that, even if it does, the distinction between Permanent and Temporary DEFRA scenarios does not necessarily create further individual issues that will need to be addressed in this litigation that would therefore defeat predominance, then they have failed to meet their ultimate burden to certify the Damages Class.

In ruling on Plaintiffs' motion to certify class, the Court does not reach any final conclusion at this stage regarding which party is correct as to Defendant's proffered distinction between different members of the Damages Class.  However, having reviewed the parties' arguments and proffered expert analysis on this subject, the Court finds that, at the very least, Defendant has put forth a colorable, persuasive basis for its proposed distinction, which Plaintiff has failed to rebut by a preponderance of the evidence.

First, a comparison between the DEFRA notice received by Plaintiffs, who all parties agree would fall within the Permanent DEFRA group, and an example of a Temporary DEFRA notice introduced into the record by Defendant, only supports the distinction as explained by Defendant.  As outlined by Marquette and King, Plaintiffs' DEFRA Notice informed them that their 2008 coverage reduction, combined with their premium payment history, has caused their policy to exceed its GPL, and presented Plaintiffs with a series of options for immediate modifications to their policy to retain tax-advantaged status; the sample Temporary Notice, on the other hand, informed that policyholder that they had reached the maximum premium payments allowed under DEFRA guidelines, and that accordingly additional payments would not be accepted until their cash value had been depleted, which was projected to occur in around 18 months.

Compare (ECF No. 8-3) (Plaintiffs' Permanent DEFRA Notice) with
(ECF No. 78-3, Ex. 38 at AGLIC-BUCK-058624) (example of a
Temporary DEFRA Notice).

Second, and perhaps more importantly, Defendant, through
the reports of Marquette and King, have thoroughly outlined the
basis for their arguments regarding the distinction between
Temporary and Permanent DEFRA scenarios, explaining in great
detail the underlying considerations and calculations that AGLIC
takes into account before sending out the different forms of
DEFRA Notice. Plaintiffs' expert, on the other hand, only
quibbles generally with Marquette and King's explanations, or
lack thereof, of certain concepts, and notes that IRC § 7702
does not itself reference any such distinction. In fact, his
direct response to Defendant's extensive explanation of the
distinction appears to span only two paragraphs, and fails to
persuasively counter the reports of King and Marquette: he does
not truly address their explanations head on, explain exactly
why these distinctions do not exist or why Defendant's
explanations of their impact are incorrect, or provide any
alternative explanation for the separate forms of DEFRA notices
AGLIC sends to policyholders. Accordingly, the Court will take
into account the distinction between Permanent and Temporary
DEFRA scenarios in analyzing whether Plaintiff has met

sufficiently demonstrated the predominance element of Rule 23(b)(3).

Unsurprisingly, that distinction carries weight in this analysis.  Defendant asserts that many, if not all, policyholders who have received Temporary DEFRA Notices have not actually been damaged.  While they are temporarily limited from paying further premiums, those limits are eventually lifted — and, importantly, "[b]y paying more in premiums sooner than they otherwise might have, their policies have greater cash value than had they been funded at lower levels and not received a Temporary DEFRA Letter."  (ECF No. 88 at 13).  In support of this argument, Defendant has submitted a supplemental report from King, which walks through the underlying calculations and makes a persuasive argument for why many such policyholders in the so-called Temporary DEFRA Scenario would not only not have suffered damage, but in fact would "have greater cash value" in their accounts than they would have had otherwise, "which will generate more interest over the life of the policy."  (ECF No. 88-6 at ¶¶ 12-16).

In response, Plaintiffs' expert, for the most part, makes no attempt to dispute or disprove King's analysis or calculations, or to show that policyholders in the Temporary DEFRA scenario have not benefitted financially.  He does, admittedly, argue that this analysis ignores the fact that such

43

policyholders may suffer due to their "Guaranteed Termination Dates" changing, which could cause harm through "planning errors with respect to estate planning, family planning, financial planning, and the like." (ECF No. 89-9, Ex. F at ¶ 28). However, Plaintiffs' expert not only fails to support this contention beyond stating that "[i]n my opinion, the additional premium payments will eventually reflect different Guaranteed Termination Dates on subsequent annual reports," he also makes no attempt to demonstrate how such damage might be shown on a class-wide basis using common evidence, as opposed to requiring individual class members to prove damage using individual evidence.

Defendant notes that even some policyholders who enter the Permanent DEFRA Scenario may in fact benefit as well. As most AGLIC policies have a level "death benefit," the "cash value remaining in the policy at the time of an insured's death is not added to the death benefit" that is paid out by the policy. (ECF No. 74 at 49). Accordingly, when an insured dies after a policy enters the Permanent DEFRA Scenario, Defendant argues that they avoid having paid the premiums they would have otherwise lost when the death benefit was paid out, because the DEFRA Notice, and its concurrent restriction on paying further premiums, stops them from doing so. Based on this line of thinking, those class members that are beneficiaries or estates

44

of deceased policyholders may need to demonstrate that they did not ultimately save money from having entered a DEFRA violation scenario.  Plaintiffs, for their part, do not appear to address this argument or the potential individualized evidence it may require at trial.

As the Court has noted repeatedly, Plaintiffs bear the burden here of demonstrating, by a preponderance of the evidence, that the Damages Class's breach of contract claim is provable via class-wide evidence and a cognizable class-wide theory of damage.  The Court finds that they have failed to do so, and that Defendant has persuasively shown the serious risk that individualized evidence and theories of damage might ultimately overwhelm a class-action trial.

### B. <u>Ascertainability</u>

The Court further finds that Plaintiffs motion fails under the ascertainability prong as well.  "Many courts and commentators have recognized that an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria." <u>Grubb v. Green Tree Servicing, LLC</u>, 2017 U.S. Dist. LEXIS 117465, at *47 (quoting <u>Marcus v. BMW of N. Am., LLC</u>, 687 F.3d at 592-93) (internal citations omitted).  The Third Circuit, for example, has held that this requirement serves significant objectives.  <u>See</u> <u>id.</u>

"First, it eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members." Id. at *48 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 592-93). Second, "it protects absent class members by facilitating the best notice practicable under Rule 23(c)(2) in a Rule 23(b)(3) action." Id. (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 592-93) (internal citation and quotation marks omitted). Finally, an ascertainable class "protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." Id. (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 592-93).

To demonstrate ascertainability, the Third Circuit requires a plaintiff to show: (1) the class is defined with reference to objective criteria, and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. Id. (citing Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015)). A plaintiff need not identify every class member at the class certification stage but must simply show that "class members can be identified." Id. (quoting Byrd, 784 F.3d at 163).

As described above, Plaintiffs here have chosen, through their revisions to the Damages Class definition in their reply brief, to exchange potential predominance questions for a host

46

of ascertainability issues.  First, it appears that, given the inclusion of a "contractually entitled" requirement in Plaintiffs' revised class definition, ascertaining which policyholders qualify as class members may require repeated review of individual contracts to determine whether they actively required AGLIC to send Annual Reports or Illustrations containing the information at the center of this case.

Plaintiffs contend that this is not the case, pointing to the fact that a high percentage of the policyholders that they have currently identified as potential class members had policies with language nearly identical to that of the Buck Policy.  Accordingly, Plaintiffs seem to argue that Defendant is being disingenuous in implying that it would be difficult to ascertain class members, because they of course should be able to easily determine which policyholders have policies based on the specific Policy Forms already identified.

However, it appears that Plaintiffs have largely missed the point Defendant has attempted to make.  The Court agrees that it seems unlikely that AGLIC would be incapable of determining which policyholders' policies used the same form contract as the Buck Policy as their base, or that class certification should be denied simply because it might take genuine manual effort on AGLIC's part to compile a comprehensive list.  Were the Damages Class definition confined only to those policyholders with that

specific language in their policy, Plaintiffs might be correct that ascertainability should not be a true issue.

But that is not the class definition Plaintiffs have put forth.  Instead, the proposed Damages Class would encompass any and all AGLIC policyholders who were "contractually entitled" to an Annual Report or Illustration that included specific "forward-looking" information — regardless of whether the contractual entitlement was created by the inclusion of the specific language found in the Buck Policy, or through some other entirely different contractual formulation or combination of separate contractual provisions.  While Plaintiffs' breach of contract claim here has been allowed to proceed past the pleadings stage, that required the Court to analyze the specific, separate provisions of the Buck Policy to determine if they had sufficiently plead that they had a contractual right that could have been breached.  Defendant has pointed out that the specific form contracts that include the language relied upon by Plaintiffs here are only 38 of more than one thousand different Policy Forms utilized at different times by AGLIC and the dozens of previously separate companies it now comprises. (See ECF No. 88-1 at ¶¶ 2-8).

And, as the small number of policies currently before the Court make clear, the terms may vary enough from one policy to the next so as to make it impossible to ascertain based on only

48

a quick scan of the specific contract whether it bestowed the contractual requirements at the core of the Damages Class definition.

As just one example, Defendant's Exhibit 7 is a policy which, from the Court's review, appears to include language requiring the provision of a forward-looking Illustration upon request that is identical to that of the Buck Policy; however, while the policy does require the provision of an annual report, its language is different and does not appear to include any requirement that the report include the types of forward-looking information Plaintiffs base their claims on here.  (ECF No. 75-11, Ex. 7 at 16-17).  Defendant's Appendix A further demonstrates the variety to be found in only a small number of policies introduced into the record at this stage, again making up a small percentage of the apparently vast universe of different policy forms that the dozens of previously separate companies that now comprise AGLIC have offered to customers over the course of decades.  (ECF No. 75-1).

Plaintiffs argue that Defendant should simply be able to check its records to see, for example, which policyholders had Illustrations sent to them, and brush off Defendant's contention that AGLIC has sent Illustrations and Annual Reports with forward-looking information even to some policyholders whose policies did not contractually entitle them to such information.

While Plaintiffs seem to believe such an occurrence to be
extremely unlikely, the Court disagrees; especially in an
industry where many policyholders may be working with an
insurance agent who has a deeper understanding of life insurance
and the types of information useful to consider when deciding
whether to alter your coverage or premium payments — as the
Bucks here did — it seems entirely plausible, if not almost
likely, that even some policyholders who did not have an
explicit contractual right might, through their agent, request
such information in an Illustration and ultimately receive it.
Plaintiffs have put forth no evidence to show that this highly
plausible scenario could not have occurred, nor persuasively
explained how a simple pulling of such records would
sufficiently answer a question that required this Court's
analysis in its October 31, 2018 Opinion to determine for the
Buck Policy.

Accordingly, to determine whether policyholders with any of
the other 950+ policy forms were similarly "contractually
entitled" to Annual Reports or Illustrations with this specific
information, the Court very well may need to engage in
individualized factual review of the specific policies of those
policyholders, and determine on a repeated basis whether
separate policies actually created such a contractual
entitlement.  This form of "file-by-file review" to determine

50

which policyholders had contractual entitlements that would
render them a potential class member very well could amount to
the type of "'mini-trial[s]' and 'individualized fact-finding'
that undermines ascertainability and makes class treatment
inappropriate." Coleman v. Commonwealth Land Title Ins. Co.,
318 F.R.D. 275, 292 (E.D. Pa. 2016). Plaintiffs bear the burden
of demonstrating, by a preponderance of the evidence, that the
Court will not find itself in such a situation. The Court finds
that they have failed to do so, and accordingly their Damages
Class cannot be certified.

And this is not the only ascertainability issue as to the
proposed Damages Class. Plaintiffs' class definition does not
only require that class members have been contractually entitled
to specific forward-looking information in their Illustrations
or Annual Reports; it also requires that they followed the
planned premiums outlined in the Illustration or Annual Reports
they received. However, Plaintiffs' reply brief and sur-reply
brief make clear that their proposed Class does not truly
comprise all policyholders who paid their premiums — instead,
they mean their class to comprise those policyholders who *only*
followed the planned premiums in their Illustration or Annual
Report, without making any other changes or taking other actions
that could impact the assumptions underlying the forward-looking
information AGLIC had provided them. As the Court explained in

its predominance analysis, this further restriction of the
proposed class does make some sense: without it, Plaintiffs
would undoubtedly face serious hurdles in proving by a
preponderance of the evidence that a trial would not devolve
into an extensive, wide-ranging attempt to adjudicate the
specific premium payments, coverage reductions, and other policy
changes made by different individual policyholders after the
reception of their Illustration or Annual Report, and the extent
to which those changes might be the true cause of a policy
entering a DEFRA scenario.

But this new constricting of the proposed class definition
raises two other issues.  First, it does not appear to provide a
clearly objective and readily applied manner for determining
which potential class members actually meet this requirement.
At different points in their briefing and in their expert
reports, Plaintiffs refer to both policyholders who were "merely
following the Planned Premiums," (ECF No. 83 at 1), and to
policyholders for whom there was "no subsequent change in the
face amount or riders or benefit options, and no *material*
deviation in the amount of the payments of planned premiums."
(ECF No. 83-3, Ex. A at ¶ 33).  However, Plaintiffs fail to
clearly define what they mean by "merely" or "material" in this
context.

If the proposed class definition is only meant to include those individuals who strictly and exactingly followed their planned premium payment schedule with no other changes, as implied by Plaintiffs' expert, then at the very least that should be somewhat easily determined by a review of AGLIC's records.  However, as Defendant notes, Plaintiffs must not mean that to be their class definition, because if so, Duane Buck himself would not appear to be a class member due to the extended period in which planned premium payments were not made on his account — regardless of whether the Bucks or AGLIC was at fault for those late payments.

And if the Damages Class might include those policyholders who closely followed their planned premiums but made some undefined changes or took some other undefined actions, Plaintiffs have only managed to introduce yet another possible need for extensive, individualized fact-finding in this litigation.  Relatedly, Plaintiffs' expert, at one point in his supplemental report, states his belief that "[i]f any change is enough to cause a DEFRA violation, then it is definitely a 'material deviation.'"  (ECF No. 89-9, Ex. F at ¶ 27).  Rather than supporting Plaintiffs' view here, however, this added color only further underlines the extent of the ascertainability problem with the Damages Class: requiring proof that a class member did not make any changes to their coverage or premium

53

payments that caused a DEFRA violation, in a class that consists only of members whose policies have violated DEFRA, would guarantee that the Court and the parties would need to engage in the exact form of individual fact-finding the ascertainability requirement is meant to avoid.

Simply put, without a bright, easily applied line between class members and non-class members, the Court would risk of being drawn into a process of mini-trials to determine exactly whether individual policyholders had followed the planned premium payments outlined in their specific Illustrations or Annual Reports closely enough to qualify as a member of the Damages Class.  For this reason as well, the Court finds that Plaintiffs have failed to meet their burden to demonstrate that the Damages Class is "currently and readily ascertainable based on objective criteria."  Marcus, 687 F.3d at 593.

## CONCLUSION

For the reasons expressed above, Defendant's motion to certify class (ECF No. 68) will be denied.

An appropriate Order will follow.


Date: February 25, 2021                    /s Noel L. Hillman
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.